The bill stated that James A. Bayard was an attorney and counsellor at law, and Allen McLane the collector of the United States for the Delaware district, in April 1812, when the said collector "seized as forfeited under the laws of the United States the ship Good Friends, Robert Thompson, master, then lying at New Castle, belonging to Stephen Girard, of Philadelphia." That by a, contract under seal, dated 21st of April, 1812, reciting the said seizure, it was agreed between the said Allen McLane and James A. Bayard, that the said J. A. Bayard should render his services as counsel in the courts of the United States, for the purpose of obtaining the condemnation of the property seized as aforesaid; and, in consideration thereof, the said A. McLane agreed and promised to pay to the said J. A. Bayard, one moiety or half part of what should be finally recovered *Page 140 
under or by virtue, or in consequence of the said seizure; and the said J. A. Bayard agreed, in case nothing should be recovered, to demand no compensation for any services he might render. This agreement was varied on the 22d of April, under the hands of both parties, so as to take in Louis McLane, the collector's son, "as one of the counsel in the case relative to the ship Good Friends; to divide with both the said parties, so that each should be entitled to one-third of what might be recovered; the whole amount recovered to be divided into three equal parts." It was further varied by an indorsement in writing, under the hand of said Allen McLane, dated May 8th, 1813, as follows: — "I agree that the within arrangement shall apply to all the Amelia Island cases which were pending at the date thereof."
The ship Good Friends was seized by the collector on the 19th of April, 1812, and both ship and cargo were libelled in the District Court on the 5th of May, 1812. The libel against the ship was heard before said court on the 26th, 27th, 28th and 30th days of November, and the 1st, 2d, 3d and 4th days of December, 1812, and was held under advisement by the court until the 15th of March, 1813. That the services of Mr. Bayard were rendered in the said cases which proceeded under his direction, and was argued by him on the days before stated. By the decree of the District Court, made March 15th, 1813, the ship Good Friends was condemned as forfeited for a violation of the laws of the United States, whereby the said Allen McLane became entitled to one moiety of the forfeiture. From this decree an appeal was taken to the Circuit Court, and remained there pending until the 29th of September, 1818. "That the same state of facts and the same principles of law existing and being applicable to the case in which the cargo of the ship Good Friends was libelled, the argument and decision in the case against the ship determined also the case against the cargo," and a decree was entered in said District Court, condemning the cargo as forfeited on the 18th of April, 1813: from which decree an appeal was also taken to the Circuit Court, and remained there pending until the 29th of September, 1818. That the services of Mr. Bayard were rendered for Col. Mc Lane "in the case against the cargo of, as well as in the case against the ship Good Friends, until and after the said decree of condemnation and said appeal taken as aforesaid." That after the decrees so entered in the District Court, J. A. Bayard was appointed one of the commissioners to negotiate a treaty of peace with Great Britain, and *Page 141 
sailed from New Castle on the 9th of May, 1813, with a prospect of being absent but a few months; and the said causes remained in charge of the said Louis McLane, associate counsel under the agreement of the 22d of April, 1812. Mr. Bayard's absence in Europe was prolonged until July, 1815, when he returned on the 31st of that month prostrated by sickness, and died in Wilmington on the 6th of August, 1815.
By act of Congress, passed 29th of July, 1813, the secretary of the treasury was authorized to remit, and did, on the 24th of February, 1814, remit to Stephen Girard, the owner of the ship Good Friends and her cargo, all the forfeiture incurred by him by reason of the facts stated in the information on which the said decrees in the District Court were rendered, upon payment of costs, and also upon payment of double duties on the goods imported in said ship.
The cases in the Circuit Court on appeal from the District Court came on to be heard on the 29th of September, 1818, when the decrees of the said District Court were affirmed, subject to the operation of the act of Congress aforesaid, and of the said remission of the secretary of the treasury. From these decrees of the Circuit Court appeals were prayed by Mr. Girard, to the Supreme Court, and citations issued, but "the said appeals were abandoned by the claimants and never further prosecuted." Neither were the cases contested in the Circuit Court, but the decrees there "were formal entries made by arrangement of counsel, and leaving to the claimant the opportunity of contesting the cases in the Supreme Court of the United States, if he thought fit to avail himself of it, which he in fact never did, but submitted to the said decrees of condemnation in the said District Court, subject to the operation of the act of Congress of July 29th, 1812, and of the aforesaid remission of the said secretary of the treasury."
The ships "Amazon" and "United States" were with their cargoes seized by Col. A. McLane on the 20th of April, 1812, for alledged violations of the laws of the United States. These with the Good Friends, were called the "Amelia Island cases," and as such referred to the memorandum of the 8th of May, 1813. Informations against the ship United States and cargo and the Amazon and cargo were filed in the District Court on the 5th of May, 1812. "The said ships and their cargees stood in precisely the same situation in law and as to facts as the ship Good Friends, and the said causes were suffered to await the decision of the cases against the said ship Good *Page 142 
Friends; and it was understood by the counsel on both sides, that the decision of the cases against the Good Friends and her cargo would settle the whole of the cases in "principle and fact." That after the decrees in the District Court in these cases, and the passing of the act of Congress of 29th of July, 1813, the owners and claimants in these petitioned the secretary of the treasury for remission of the forfeitures; which remissions were granted accordingly on the sameterms as in the case of the Good Friends and cargo. These remissions were granted in 1813, and were pleaded by the several claimants in each case in the District Court in November, 1817; since when the cases have remained open and undetermined, the remissions directing all further prosecution of the cases to cease on payment ofcosts and double duties as aforesaid. That Allen McLane, in consequence of the seizure of the ships "Good Friends," "Amazon" and "United States" and their cargoes, became entitled to one moiety of all the duties payable according to the terms of said remissions. That the United States received large sums of money under said remissions: that Allen McLane in his lifetime received a large amount as his moiety of said duties, and the balance has been paid to Louis McLane, the defendant, since the death of said Allen McLane. That in consequence of Mr. Bayard's agreement with A. McLane, of the 21st of April, 1812, he was obliged to decline acting as the counsel of Stephen Girard; and also of Thompson Maris, claimants of the cargo of the Amazon., by reason of which he was deprived of large emoluments.
Complainants, Richard H. Bayard, Ann Bayard and James A. Bayard, aretogether with the defendant, Louis McLane, the executors of James A. Bayard, deceased, and the other complainants, are the children and residuary legatees of said James A. Bayard. The defendant, Louis McLane, is also the executor of Allen McLane, deceased.
No part of the money so received by Allen McLane as his moiety of the duties aforesaid, has ever been paid to J. A. Bayard or his representatives; and no part of the money so received by Louis Mc Lane, as the balance of said moiety, has ever been accounted for and paid to complainants by him, either as one of the executors of James A. Bayard, or as the executor of Allen McLane.
The bill further asserted that James A. Bayard did, in his lifetime, substantially perform his part of the agreement of 21st of April, 1812, with its modifications, and did render his services as counsel of the *Page 143 
said A. McLane, for the condemnation of the said vessels and their cargoes, according to the terms of said agreement as modified: that in relation to a dispute which afterwards arose between the U. States and A. McLane, as to the sum due him for his moiety of said duties, Mr. Bayard was not bound to render any services as counsel in reference to said dispute, though complainants admit that his estate being interested therein, a proportionable share of the expenses of obtaining a settlement of said dispute, ought to be deducted from the amount due to said estate.
The bill prayed that defendant might be decreed to account for all money received either by Allen McLane or by Louis McLane, for or on account of the moiety of the duties accruing upon the cargoes of the Good Friends, United States and Amazon, which became vested in said A. McLane in consequence of the seizure of said ships, and which were payable according to the terms of the remissions aforesaid; and topay to complainants such part or portion as shall shall appear to be due to them as residuary legatees of Mr. Bayard, under the agreement aforesaid, and its modifications aforesaid, deducting proper costs and expenditures incurred in settling the dispute between the United States and collector, about the division of said double duties. And prayer for general relief, in the usual form.
The answer admitted that A. McLane, being collector of the Delaware district did, on or about the 20th of April, 1812,seize the ship Good Friends and cargo, owned by Stephen Girard; the ship Amazon and cargo, owned by Thompson Maris and others; and the ship United States and cargo; as forfeited for violation of the "non-intercourse acts:" that libels were filed by the district attorney in the District Court, against said ships and cargoes respectively, twenty-four in all, one of which was against the ship "Good Friends," and another against her cargo; that soon afterwards these ships and cargoes were delivered up to the several claimants, on their giving bond for the appraised value in case of condemnation, and also on giving regular duty bonds; which last bonds were afterwards paid and accounted for as on ordinary duty bonds: that the informations against the ship Good Friends and cargo were regularly prosecuted to issue and condemnation in the said District Court, and sentence of condemnation was pronounced against the ship in March, and on the cargo in April, 1813, from which sentences appeals were taken to the Circuit Court of the United States, where, in September, 1818, *Page 144 
such sentences were affirmed, subject to claimant's right to a remission of the forfeitures, upon complying with the conditions of a remission referred to in the proceedings; and from those decrees of affirmance appeals were prayed and granted to the Supreme Court of the United States, hut never prosecuted in that court, because the claimants elected to comply with the conditions of the remissions aforesaid, granted as early as the 24th of February, 1814. The other informations against the ships Amazon and United States and their cargoes, never proceeded to judgment or trial, hut were continued in the District Court until ended by the conditional remissions: that during their pendency, applications were made by the claimants to the court for statements of facts whereon to ground applications for remission, which applications were resisted by the collector, who employed counsel for that purpose; and after the remissions were granted he contested their efficacy to divest his interest in the forfeitures. In these contests he also employed counsel, and he persevered in asserting that the government had no right to release his interest in the forfeitures, and in maintaining his rights, until the principle was supposed to be judicially settled against him in the case of another collector: that in most, if not all of these collateral contests, continued for many years, the district attorney of the United States was either neutral or opposed to him; and he had to carry them on with the aid of counsel, employed at his own expense: that the contest finally resulted in one with the United States, on the question of how much and what part of the duties exacted from the claimants as the condition of remission, fell to him as in the nature of forfeiture, he claiming a moiety of the whole, as resulting to him as seizing officer:
this question was brought to issue in October, 1822, on a case agreed between the district attorney of the United States and C. A. Rodney, Esq., counsel for the collector: "it being true, as the complainants say in their bill, that so distinct were the principles on which this controversy turned from any involved in the original seizures and informations, that his said counsel, Mr. Rodney, was the counsel of Stephen Girard, the claimant of the ship Good Friends, and cargo." Upon that case agreed the Circuit Court gave judgment against the collector, from which he appealed to the Supreme Court of the United States, where that judgment was reversed "and the claim of the collector established to its full extent."
The answer admitted also the agreement and modifications as stated, and that the "Amelia Island cases" referred to in the memorandum *Page 145 
of May 8th, 1813, were the cases of the three ships aforesaid and their cargoes; and that Mr. Bayard, on the day of the date of the last of said agreements, did leave the United States and never returned, but in a dying condition.
The defendant did not admit the connection and mutual dependency on one another of the cases in the District Court, and did not believe that such connection existed to the extent set forth in the bill, "and in particularlar, that although the case of the cargo of the said ship Good Friends must, as he presumes and believes, have turned on the same general principles and facts as that of the ship itself, yet as they were argued and determined at different times in the District Court, with an interval of a month, he presumes and believes there was some point of law or fact on which the two were supposed to admit of some discrimination, or at least some evidence necessary to be supplied in the one and not requisite in the other; nor does this defendant know, believe or admit, that the decrees of the said Circuit Court affirming the said sentences or decrees of the said District Court, in the cases of the said ship Good Friends and her cargo, were formal entries made by arrangement of counsel and without contest, though he believes the cases were not argued on the question of reversal or affirmance at the bar of the said Circuit Court." He believes that Mr. Girard, although he had obtained a remission as early as the 24th of February, 1814, seriously prosecuted his appeal from the District Court, and seriously contemplated further prosecutions of the same in the Supreme Court, and would have done so but for fear of being compelled to elect whether he would accept the remission; as it was he managed to carry on the litigation for five years after he had the remission in his pocket, involving the collector in double vexation and expense. Nor does the defendant admit that the Amazon and United States and cargoes stood in precisely the same situation, in law and fact with the ship "Good Friends," or were suffered to await the decision of that case; on the contrary he has understood and believes, that each of the two classes of cases, (classing the cargoes, with the ships respectively,) depended on evidence peculiar to each case; the cases of the Amazon and United States and cargoes being more favorable to the claimants than the cases of the ship Good Friends and cargo; and that the latter was the more flagrant and plain case for condemnation.
"As to the said several agreements between the said J. A. Bayard and A. McLane, this defendant in the first place submits to the court *Page 146 
that no obligation as of contract, capable of being enforced at law or equity arose out of the same; that they were honorary in their effect and imposed no duty cognizable at law or equity; and moreover, if not positively illegal, they were against the manifest policy of law, and especially against the well settled policy of this court and of every other court of equity, and so always repudiated from the assistance of equity to carry them into effect, as tending to champerty andmaintenance."
But he also contends that there never has been any execution or performance of said agreements on the part of J. A. Bayard, laying any consideration legal, equitable or moral, for any claim to a share of the proceeds and avails of the judgment of the Supreme Court establishing the collector's right to a moiety of the duties exacted of the claimants by the law of remission. That the entire consideration for said agreements had failed at the death of Mr. Bayard, and had never been supplied. On this account as well as because of an entire change of the whole ground of controversy, and of the title and claim by which Col. McLane, without any aid from Mr. Bayard, finally recovered anything, the complainants' claim has no just or equitable foundation.
He admits that J. A. Bayard took part in the argument before the District Court in the case of the ship "Good Friends," which was all the service he ever rendered in that case, except occasional consultations and advice before the trial. And such an argument before the court of first instance, over whose decision two appeals lay, was the least important and the least consequential of all the services stipulated to be performed. That in truth there has been no avails either from that argument itself or from the case in which it was made, as the avails arose from the cargo and not the ship; and from remission, not from condemnation. He denies that Mr. Bayard rendered any service in the separate case of the cargo of the Good Friends, except what might have resulted from the influence of his argument in the case of the ship. "He believes, but is not quite certain, that there was no argument of counsel in the separate case of the cargo." Mr. Bayard took no part in either of the cases, after they were removed by appeal to the Circuit Court, and never rendered any service in the cases of the "United States" and "Amazon," in performance of the memorandum agreement of the 8th of May, 1813, which was altogether prospective and executory, and looked to services to be performed after Mr. Bayard's return from Europe. *Page 147 
The answer further contended that the fund finally recovered was in no respect the fruits of condemnation, or of any recovery, within the contemplation of the parties to the agreements: that the whole of the fund itself, and the claim and title of the collector to it resulted from circumstances, and from an event and judicial decision of an entirely new case, created after Mr. Bayard had ceased to act as counsel under said agreement; and conducted and concluded at great trouble and expense to the collector. The defendant cannot estimate the amount of such expenses, but they were very great. He is also unable to render an exact account of the money received by A. McLane in his lifetime or now due to himself, until certain settlements are had at the treasury. The district attorney of Philadelphia collected of Mr. Girard, as double duties $53,245 00, of which there was paid into the treasury $26,622 60, and to A. McLane $14,622 60.
The defendant denied any admissions to either of complainants of any interest which J. A. Bayard's estate had in the suit of A. McLane with the United States; on the contrary, he supposed that Mr. Bayard in his lifetime, and his representatives since, had fully waived and abandoned any idea of interest under said agreements.
The defendant, also, in an amended answer to complainants' bill, set out the fact that J. A. Bayard was retained as counsel for theUnited States in the case of the Good Friends, and paid for his services in said cause a fee of five hundred dollars; upon which he contended that Mr. Bayard was fully paid by the United States, for all the professional services he rendered in that case; and that he never Tendered any service whatever to the said Allen McLane.
Upon the hearing below, the chancellor dismissed the complainants' bill on the following grounds: 1st. That this being a contract between attorney or counsel and client, entered into pendente lite, it was invalid and void, if not on account of its tendency to champerty and maintenance, upon the ground of the confidential relation subsisting between them and the great power and influence of the former over the latter. (Walmsly vs. Booth, 2 Atk. 25:Saunderson vs. Glass, 2 Atk. 296; Welles vs.Middleton, Cox 12; Orman vs. Hutchinson, 13Vesey, jr. 52; Morse vs. Royal, 12 Vesey,jr. 372; Wood vs. Downes, 18 Vesey, jr.
119.) 2d. That the memorandum indorsement of the 8th of May, 1813, designed to extend the contract of April 21, 1812, to all the Amelia Island cases, was not a contract for want of the assent of Mr. Bayard, which did not appear. 3d. That the contract *Page 148 
of 1812, was executory in its nature, and bound Mr. Bayard to renderhis services as counsel in all the courts of the United States until final recovery: — that these services could not be substituted by another; — that the entire performance of these services was a condition precedent to the right of recovery, either at law or in equity; (the parties here being in equity merely because the defendant is executor of both the original parties, and could not be sued at law:) that such performance was not rendered by Mr. Bayard before his death; and he was not entitled to compensation either on the ground of performance, or on a quantum meruit as for a part performance. (1 Vent. 177, 219; 3 Salk. 95, Powellon Conet. 358; 2 Doug. 698; 1 H. Blac. 273,n.; 2 Win. Blac. 1312, Thorpe vs. Thorpe, LordRaymond, 665, Holt 28, 96; 8 East 437; 6Maule Sel. 78; 7 T. Rep. 381; 1 East 619; 8Taunt. 576; 6 East 710; 6 T. Rep. 320,Cutter vs. Powell, 2 Smith's Cases 1; 23 LawLib. 1; 1 Eq. Ca. Ab. 209; 2 Ibid 210; 2Bibb 410; Shep. Touch. 180; Drew vs.Hanson, 6 Ves. 678; Ker vs. Clobbery,Sugd. Vend. 251; 17 Ves. jr. 401; 14 Ibid 149; 1Cox 274, Poole vs. Shergold, 13 Ves.
78.) And if the case had been put on the ground of a claim for part compensation to the extent of the services rendered, he would have considered himself precluded by Mr. Bayard's receipt for $500, in full for the whole amount of service rendered from sending any issue to a jury to find by their verdict, that which the parties in their lifetime had fully adjusted, valued and settled.
Whereupon this appeal was taken.
The appeal was elaborately argued at a previous term before judges BLACK, HARRINGTON and LAYTON; by Messrs. Frame and ReverdyJohnson (of Baltimore) for the appellants, and by Messrs.Wm. H. Rogers, Meredith and Sergeant (of Philadelphia,) and Walter Jones (of Washington City,) for the respondent. In consequence of the death of judge Black, before judgment, no decision could be made; and the cause now stood for another hearing, the court now consisting of R. H. BAYARD, Chief Justice, and Judges HARRINGTON, LAYTON and MILLIGAN.
Frame, for complainants, moved the court to certify to the governor "that there is a legal exception to the chief justice and judge Milligan, so that there is no quorum in the court to try this cause;" — with a view to the appointment of a judge ad litem.
The chief justice was a party; and judge Milligan the brother-in-law of the other party. *Page 149 
The Constitution,. (Art. 6, sec. 7.) makes this court, on appeal from chancery, to consist of the chief justice and three associate judges, any three of them to he a quorum. Sec. 9 provides, that the governor shall have power to commission a judge ad litem to decide any cause in which there is a legal exception to the chancellor or any judge, so that such appointment is necessary to constitute a quorum in either court. The Legislature by act of 1832 (8 vol. 93, sec. 7,) enacted that "interest in the event of a cause either of himself or of his parents, grand-parents, children, grand-children, his brother, sister, nephew or niece, uncle or aunt, his brother-in-law or his son-in-law, shall he deemed cause of legal exception to a judge;" and it shall be the duty of the governor to commission a judge ad litem, if such appointment be necessary to constitute a quorum. But the Legislature by act of 1833 (8 vol. 285,) repealed the act of 1832, so far as it fixed the causes of disqualification.
Per Curiam:
It is difficult to account for the course of legislation on this subject, but it was certainly not designed by the Legislature of 1833, in repealing the 7th sec. of the act of 1832, to express the opinion, that the matters therein contained should no longer be deemed causes of legal exception to a judge. This is evident because a direct interest in the event of the suit is one of the causes of exception mentioned in that section, and the Legislature cannot be supposed to have intended to deny that this was a legal ground. The Legislature would not even have the power to remove such an exception, as it is a fundamental principle of natural justice, recognised by the constitution in the provision forimpartial trials, that no man shall be the judge in his own cause. It is probable, therefore, that the Legislature considered this seventh section as containing an imperfect summary of the various grounds of legal exception; or more probably thought that any
legislative construction was unnecessary and improper as a guide to the courts, which might be safely left to establish causes of legal exception for their own government, there being at least no danger that any judge would desire to sit, or would sit, in an improper case.
The common law seems to have been very jealous on this subject, and anxious to exclude the judge in any case where there was any degree of interest or relationship calculated to bias his judgment. This caution has been even extended by the judges themselves acting on their own feelings of delicacy, where such feelings could *Page 150 
be indulged without a denial of justice. Anciently a judge could not try a civil or criminal case in the county in which he was born or inhabited (3 Chit. Gen. Prac. 9;) and extreme of caution that has not been brought clown to modern times, but which was not without foundation in correct views of the human character. It has even been followed to a certain extent in the organization of our Superior Court, in which neither of the associate judges is allowed to sit in the trial of causes in the county where he resides.
Although this strictness of the common law has been done away with by statute in England, as being inconvenient in practice and unreasonable, yet the bias arising or supposed to arise from interest or relationship, is still deemed legal exception to a judge. It seems recently to have been decided, that a judge could not sit in a cause wherein his deceased wife's nephew was interested; a degree of connexion or relationship far more remote than that of judge Milligan to one of the parties in this cause.
It would be difficult and improper at present to lay clown any general rule on the subject. The books do not announce any such rule, but those of high authority indirectly apply to it the same reasons that would operate as an objection to an arbitrator, or constitute a ground of challenge to a juryman. (3 Chit. Gen. Prac. 10; 2 Ibid
83; 4 Mod. 226; Comb. 218; Hard. 44;Hob. 87; 3 Blac. Com. 299.) "Affinity or alliance by marriage is a principal challenge (to a juror,) and equivalent to consanguinity when it is between either of the parties, as if the plaintiff or defendant marry the daughter or cousin of the juror, or the juror marry the daughter or cousin of the plaintiff or defendant, and the same continues, or issue be had which is still living." (1Co. Litt. 157, a. 1 Leon 88.)
At present it is only necessary for us to say, that the relationship of brother-in-law to a party in the cause (and of course of uncle to the children of such party,) is a legal exception to a judge, and disqualifies him in law from sitting judicially in the cause, however it may be in point of fact. We doubt not that the fear of bias arising from such relationship would be quite as likely to influence the judge against the party to whom he is related, but that also would show that the exception is a proper one, and that all danger of bias either way ought to be avoided.
We therefore direct an entry to be made on the records of this court that in the case now pending, wherein Ann Bayard et al. are complainants, and Louis McLane defendant, there is legal exception to *Page 151 
the Hon. Packard H. Bayard, chief justice, and the Hon. John J. Milligan associate judge, two of the judges of this court; so that the appointment of a judge ad litem is necessary to constitute a quorum for the trial of said cause; and it is further ordered and directed, that the clerk certify a copy of this entry to His Excellency, the Governor.
Upon this certificate the governor appointed and commissioned the Hon. George B. Rodney, of New Castle county, a judge ad litem, in the place of judge Milligan, and the cause was afterwards heard at an adjourned term, before judges Harrington, Layton and Rodney.
December term, 1840. This cause was now again argued by Messrs.Frame and Johnson, (with whom was Mr. Comegys,) for the appellants; and Messrs. Meredith, Sergeant andJones, (with whom were Messrs. W. H. Rogers andWales,) for the appellee.
The principal exhibits in the cause were the following: —
 No. 1. — The contract with its modifications.
Articles of agreement made the twenty-first day of April, A. D., 1812, between Allen McLane of the one part, and James A. Bayard of the other part witness, that whereas, the said A. McLane, as collector of the Delaware district, has seized as forfeited under the laws of the United States, the ship "Good Friends," Robert Thompson master, now lying at New Castle, belonging to Stephen Girard, of Philadelphia. Now it is agreed between the said parties, that the said J. A. Bayard shall render his services as counsel in the courts of the United States, for the purpose of obtaining the condemnation of the property seized as aforesaid, and in consideration thereof the said Allen McLane agrees and promises to pay to the said J. A. Bayard, one moiety or half part of what may be finally recovered under or by virtue, or in consequence of the said seizure; and the said J. A. Bayard agrees, in case nothing be recovered, to demand no compensation for any services he may render. In witness whereof the parties have hereunto set their hands and seals the day and year above written.

 A. McLANE, [L. S.]
 J. A. BAYARD. [L. S.]
 Sealed and delivered in }
 presence of }
 ANN SMITH.
 *Page 152 
23d April, 1812. Upon the request of Mr. McLane, it is agreed between him and J. A. Bayard, that the agreement made yesterday betwen the said parties, shall be so varied that Louis McLane shall be considered as one of the counsel in the case relative to the "Good Friends," and shall divide with both the said parties, so that each shall be entitled to one-third of what may be recovered. The whole amount recovered to be divided in three equal parts.
 A. McLANE,
 J. A. BAYARD.

I agree that the within arrangement shall apply to all the Amelia Island cases, which were pending at the date thereof.
 A. McLANE.
 Wilmington, May 8, 1813.
 No. — 2. Letter from J. A. Bayard to S. Spackman.
 WASHINGTON, 16th May, 1812.

Dear Sir, — I received by the mail yesterday your letter of the 13th instant. You will have the goodness to recollect the nature of the engagement you made with me as to the two ships, the Amazon and United States. You presented yourself to me only in the character of informer, and took my opinion only upon the manner and form of the information being conveyed to the collector, to entitle you to claim as informer. A legal defence against forfeiture was not thought of. If that had been the course designed to be pursued, you certainly would not have spoken of the claim of informer, which supposes a forfeiture.
The collector applied to me to be concerned for the government against the "Good Friends." The application was entirely consistent with the service I expected to render you. The service in both cases would be directed to a condemnation, and the particular interest of informer had no connection with the general question of condemnation. When I found Messrs. Thompson Maris concerned in the cases which you had retained me, I thought that I could render them important service here upon their petition, which would be in no degree repugnant to the duty I should owe the collector in the case of the "Good Friends," which was likely to take a very different direction. As it seems, however, that Messrs. Thompson Maris mean to set up a defence against the forfeiture, and not to have *Page 153 
recourse to a petition, it is very evident that I cannot serve them and the collector at the same time.
It does appear to me, that the cases are entirely destitute of defence, and I have a letter from Mr. Rodney, in which he recommends the petition. You are entirely deceived, in the suggestion that the bonds will not be prosecuted. I have taken some pains to ascertain the disposition and views of the government on the subject, and had made some progress in an arrangement which I thought highly advantageous to Messrs. M. T. As I cannot render the services which are now expected, I of course return the retainer paid me. It is in a check on the Bank of Delaware, which will be paid at the Bank of Pennsylvania.
The trouble that I have had in the business is not worth thinking of, and I have only to hope that the course which Messrs. M. T. are now pursuing may be attended with a better result than the one which I should have advised.
My engagements with you, I shall of course consider at an end.
 I am Sir, with esteem and respect, Your obedient servant, J. A. BAYARD.
MR. SAMUEL SPACEMAN.
The concluding sentence of this letter, as originally written and erased was, "My engagements ending with you, I shall of course consider myself at liberty to accede to any proposition on the other side."
No. 3. Letter from Col. McLane to James A. Bayard, dated January 13, 1813, informing him that he had just returned from Philadelphia, and that the first bonds in the Amelia Island cases became due last Saturday for duties, and he had collected them without any other difficulty than the trouble and expense of a visit to the concern. He was fearful that he should not get through with "the Superior case" as well — speaks of his difficulties and embarrassments in relation to several suits growing out of these seizures — asks advice of Mr. Bayard; and adds, "your attention to my interest multiply the many obligations I am under to you, and I flatter myself you will not have cause to say that I am unmindful of your favor."
No. 4. Letter from same to same, dated February 9, 1813, informing him of the seizure of "the French prize," which would probably occasion *Page 154 
"another disagreeable lawsuit;" and hoping that he "would consider himself as retained for the defence. He adds, "I have fallen in with the ship Tiber, from Liverpool, full of British merchandise, consigned to the same concern that was interested in the shipments last April from Great Britain. I have seized the Tiber on the Delaware, and have her at Port Penn, and if Judge Fisher continues to deliver on bond, I shall have my hands full. I wish to retain you in this case also, for which you shall be recompensed and interested as in the Amelia cases."
 No. 5. — Letter from Col. McLane to R. H. Bayard. COLLECTOR'S OFFICE, Wilmington, Del., June 12, 1816.
Dear Sir, — Inclosed I send you the records, c., in the case of the Good Friends. We are jointly interested in this case, but particularly lays on me, as I have expended considerable of my private funds. You will please to take the case into consideration, and should you be of the opinion we have any chance to recover, we will concert measures when we meet. I expect to be in Philadelphia the first week of July next.
 Most respectfully, I am Sir, Your obedient servant, A. McLANE.
R. H. BAYARD, ESQ.
No. 6. The record of the suit of Col. McLane's ex'r. vs. The United States, for a share of the double duties.
Nos. 7 to 12. Correspondence between R. H. Bayard and Louis McLane, in February and March, 1832, after the decision of the suit in the Supreme Court, claiming for Mr. Bayard's estate an interest in the amount recovered in that suit under the agreement of 1812, and proposing a reference, which was declined.
 No. 13. — Receipts of J. A. Bayard and L. McLane.
1812, December 7. Received of Allen McLane, Esq., collector of the Delaware district, five hundred dollars, paid as a fee in behalf of the United States, for services as counsel in the case of the libels at the suit of the United States against the ship Good Friends and cargo. This case involved several incidental questions, which on different occasions were discussed. The trial in chief before the District *Page 155 
Court continued eight days, and the argument four days. The valuation of the property in dispute exceeded three hundred thousand dollars, and the case was defended by three counsel retained in behalf of Stephen Girard, the claimant of the ship and cargo.
 J. A. BAYARD.
Triplicate.
1812, December 7. Received of Allen McLane, Esq., collector of the Delaware district, five hundred dollars, paid as a fee in behalf of the United States, for services as counsel in the case of the libels at the suit of the United States against the ship Good Friends and cargo. This case involved several incidental questions, which on different occasions were discussed. The trial in chief before the District Court continued eight clays, and the argument four clays. The valuation of the property in dispute exceeded three hundred thousand dollars, and the case was defended by three counsel retained in behalf of Stephen Girard, the claimant of the ship and cargo.
 Louis McLANE.
Triplicate.
 No. 14. — Receipts of C. J. Ingersoll. Philadelphia, 6th February, 1819.
As attorney of the United States of America, and by virtue of authority from the treasury department, I hereby acknowledge to have this day received from Stephen Girard, Esq., the sum of fifty-three thousand two hundred and forty-five dollars and twenty cents, being the amount, principal and interest, of the additional duties due in the case of the cargo of the ship Good Friends, libelled for forfeiture in the Delaware district, and claimed by the said Stephen Girard, which sum of money is now paid and received in conformity with the decree of the Circuit Court of the United States for the Delaware district, pronounced on the 29th clay of September last, in full satisfaction of all claim and demand on the part of the United States in the said case, and satisfaction is to be entered according to this receipt.
 C. J. INGERSOLL. Witness present.
A. McLANE. Philadelphia, 16th August, 1819.
Received this clay, Edward Thompson, Esquire, three bonds in the penal sums of $50,000 each, conditioned to pay the several sums *Page 156 
of $5,519 52, $5,519 53, and $5,519 52, in three installments, which several sums when so paid will be in full payment of his proportion or half part of the additional duties, as they are called, payable in the case of cargo of the ship Amazon, imported by Thompson Maris, and seized for forfeiture in the Delaware district, and of all suits therefor in Delaware and Pennsylvania; it being understood, however, that this is not to be considered as discharging the estate of Richard Maris, deceased, from liability in the premises.
 C. J. INGERSOLL, Attorney for the U. States and of Allen McLane, Col. of Delaware.
 No. 15. — Letter from J. A. Bayard to Caesar A. Rodney.
 WASHINGTON, 6th May, 1812.
My Dear Sir, — I received yesterday your letter dated the 4th, and which verifies the proverb, that it is an ill wind which blows no one any good. In the case of the Amazon, I was retained by Mr. Spackman as informer. He mentioned to me the names of no persons concerned in the ship or cargo. I have since learnt that the retainer was paid in behalf of Thompson Maris, of Philadelphia: But I must tell you very frankly, that I have not been able to discover the smallest ground upon which to rest a legal defence.
Will you have the bounty to communicate to me your views of the subject, in order that I may review and recall, if necessary, the advice given to Thompson Maris. I have recommended to them to petition, supposing it to be a clear case of forfeiture under the law. In the meantime I have been carrying on a quasi negotiation with the secretary, in the event of relying upon the clemency of the government. The acts of Matthews are disavowed; they must be taken as destitute of all legal authority, and I do not in consequence allow them to influence the case in my consideration of it.
I have reason to believe very good terms may be made at the treasury, and until you have the goodness to enlighten me I shall incline to think that the best course to pursue.
 * * * * * Adieu, may God bless you, Sincerely yours, J. A. BAYARD.
Among the exhibits were also the records of the District and Circuit Court, notes of Mr. Bayard's argument, c., c. *Page 157 
The leading facts presented by the bill, answer and exhibits, were the following:
1812, April 19. The collector seized the ship Good Friends and
 cargo.
 " 20. He seized the ship Amazon and cargo.
 " 23. He seized the United States and cargo.
The Good Friends was valued at $5,000: — her cargo $298,458 85
 Amazon, " 4,500 " 316,124 73
 United States, " 9,000 " 12,617 60
1812, April 21. Contract retaining Mr. Bayard as counsel.
 " 22. Contract varied so as to admit Mr. L. McLane.
 May 5. Separate libels filed against each ship and cargo.
 " 16. Mr. Bayard declines to be employed in the case
 of the United States and Amazon, to resist
 forfeiture, but solicits remission.
Nov. and Dec. Mr. Bayard argued the case of the Good Friends,
 in. the District Court,
 Dec. 7. The collector paid Mr. Bayard, and also Mr. L.
 McLane each a fee of $500, on the part of the
 government for this argument.
1813, Jan. The first duties were paid to the collector on
 the cargoes of these ships.
 March 15. The District Court entered a decree of
 condemnation in the case of the ship Good Friends.
 April 17. Decree against the cargo, without argument.
 Appeals were taken from these decrees to the
 Circuit Court.
 May 8. Col. McLane agreed that the contract of 1812
 should extend to all the cases.
 " 9. James A. Bayard sailed for Europe.
 July 29. Congress authorized a remission of the forfeitures.
 Dec. 21. Conditional remission obtained in the cases of the
 Amazon and cargo.
1814, Feb. 24. Same as to the Good Friends, on payment of
 double duties.
 March 16. Mr. Girard paid the costs in the District Court.
 June 15. Remissions in the cases of the United States and
1815, July 31. cargo. Mr. Bayard returned from Europe, and died
 Aug. 6.
1816, June 12. Col. McLane's letter to Mr. R. H. Bayard.
 *Page 158 

1817, Nov. The remissions were pleaded in the District Court.
1818, Sept. 29. The decrees of the District Court affirmed in the
 Circuit Court, subject to the remissions.
 Appeals taken to the Supreme Court, but never
 prosecuted.
1819, Feb. 6. Mr. Girard paid the United States $53,245 20, for
 additional duties on the cargo of the Good Friends.
 Aug. 16. Edward Thompson paid $16,558 57 on the
 Amazon's cargo.
1822, Oct. Suit commenced by the collector against the
 United States, for his share of the double duties.
 The Circuit Court decreed against him and he
 apealed.
1831, Jan. The death of Col. McLane was suggested.
1832, Jan. The Supreme Court reversed the decree of the
 Circuit Court, and the collector's representative
 recovered one-half the double duties.
Feb. and Mar. Correspondence between R. Bayard and L. McLane
 relative to the claim of Mr. Bayard's estate on
 the money so recovered.
 Mr. Frame, for the appellants: — Is the contract between Col. McLane and Mr. Bayard illegal? It was opposed below on two grounds, on one or both of which the chancellor decided against it, viz: 1st. "That it falls within the law of maintenance and champerty. 2d. That from the relation of the parties, as attorney or counsel and client, it is such a contract as public policy will not permit to be enforced."
1st. THE CHAMPERTY. — In regard to the maintenance, an exception is extended by all the authorities to the profession of the law. (2 Hawk. P. C. 401, tit. Maintenance, ch. 83,sec. 37-8-9; 5 Comyn's Dig., tit. Maintenance B.; 3Cowen's Rep. 648; 1 Russel on Crimes 179-80.) The 28Edw., Stat. 1, chap. 11, which is the great statute on the subject of maintenance, expressly excepts lawyers.
The mere matter then of taking a fee for the conducting a cause is not unlawful. Is there any thing in the terms of this contract that makes it illegal, or amounts to champerty, which is a species of maintenance? A contract to involve the objection of champerty, must be made with aparty to the suit; and the champertor must conduct the causeat his own expense, either in the whole or part. (4 Blac.Com. 135; 2 Coke's Institutes 208; 3 Comyn's Dig.
26, Maintenance, *Page 159 A. 2; 1 Russell on Crimes 129; 2 Chitty's Crim.Law 235, n. a.; Jac. Law Dict., tit. Champerty; 3Coke's Litt., by Thomas 531, n. L.) In this case the contract was not made by any party to these proceedings. The several informations filed against the ships Good Friends, c., and their cargoes, were filed by direction of the treasury department of the U. S., in the name of the U. S., and the suits were conducted and carried on by the U. S.; and not by, or in the name of Col. McLane. The government always controlled the proceeding; begun; had the power to stop; and did finally stop them by remitting the forfeitures to the claimants on certain terms. How in such a case could there be any danger of an improper stirring up of the suits, which is the evil to which the law of champerty was intended to apply? Where the State is a party, it cannot because of its dignity and character, be subject to the influence of the evils of champerty; and, of course, the prohibitions of the law on that subject cannot apply to such a case. For in champerty both the parties are equally criminal and equally liable to indictment. This cannot apply to the government of a country. In all cases of public prosecutions, which it is the policy of the government to encourage, this doctrine of champerty and maintenance cannot apply. The lesserpolicy which prohibits such an intermeddling in suits, for the sake of public peace and quiet, yields to the greaterpolicy of the government to encourage such intermeddling, for the sake of a greater public good. The object of these forfeitures is the due enforcement of the collection of the revenue; in these cases the non-intercourse laws proceeded on a still higher policy. They were passed in a very trying crisis of American affairs; to countervail the oppressive acts of two great powers of Europe; their object was to coerce these powers to an arrangement with this country; to a proper respect for our rights; and, incidentally to prevent the necessity of war. Of course the highest policy of the government was to enforce and procure the most rigid execution of them. The laws of the United States make it the collector's duty to bring and prosecute
these suits. (3 U. S. Laws 199; 4 ib. 243; act ofMarch, 1829; the non-intercourse act.)
If by the law of England then, there is nothing in this contract which would make it illegal as involving champerty, much less is there by the law of Delaware, I affirm that it has never been regarded as the violation of any law, much less of any criminal law of this State, for a lawyer to contract for a contingent fee — a portion of what was recovered *Page 160 
It never can be contended that the act of 15 Geo. 2, (1 DelawareLaws 239,) against barratry, maintenance and champerty embraced all the old law on this subject, as existing at that clay in England, many of the provisions of which were so absurd that they have been long since repudiated by common sense and common consent there. The old law grew out of a state of society and of things there which never had an existence here, much less at so late a day as 1812, when this contract was made. (2 Hawk. 407, et. seq.; Stat. 28, Edward
1, ch. 11; 2 Hume's History of England 319-20; 2Coke's Inst. 209; 3 Cowen's Rep. 643 to 646; 4Term, Rep. 340; 1 Russell on Crimes 179.)
The assignment of a chose in action was originally considered a clear act of maintenance. But at the time of the passing of our law against maintenance, such an assignment was clearly legal here. Our act of 15Geo. 2, (1 Del. Laws, 117,) could never, therefore, have been intended to introduce the whole English law of maintenance.
The practice and usage and common opinion of the profession has influence in the construction of a statute, especially as to its extent. (5 Crunch Rep. 22, 31-2; 1 Harr. Rep. 560,Martin's lessee vs. Roach.) It is often an important ingredient in legal judgment. (9 Law. Lib. 6, 7, 8, Ram. onJudgment; 1 Taunt. 448.) I state it then as the uniform opinion of the bar of this State, who have practised accordingly, that unless the agreement to divide the avails of the suit was also accompanied by an agreement on the part of the attorney to pay costs, it would not be a violation of the law prohibiting champerty. Such I have shown to be a material ingredient in the offence under the English law; and is contained in the definition of champerty, as referred to by the Legislature in the margin of the act of 1819.
I conclude then, that this contract cannot be objected to for any supposed violation of the law against champerty.
2d. ATTORNEY AND CLIENT. — I proceed to examine the other objection, that a court of equity will not enforce a contract between attorney and client, because of the supposed influence of the one over the other.
I do not deny that there are many cases in the English books which show that Courts of Chancery look with a jealous eye on such contracts; and, in many cases, have refused to enforce them. These are cases ofattorney and client, and not of counsel and client; for in *Page 161 
England the compensation of counsel is always honorary, and never to be enforced at law or in equity. (3 Blac. Com. 28; 2 Atk.Rep. 332.) Mr. Bayard's contract was to render service ascounsel. Such contracts could not be enforced there in any court: and the cases cited cannot be supposed to apply to counsel; but, in this State, and in most if not all the States of this Union, and in the United States courts, a contract with a lawyer for professional services as counsel may be enforced, either at law or in equity.
The reason of the English rule is often said to be based upon the supposed influence of the attorney over his client. In my view the true reason is derived out of their statutory enactments which fix the fees of the attorney, beyond which he can by no contract go, and in relation to which he is not permitted to make any contract, other than that which the law establishes. (Tidd's law of costs 86-7, 92.) TheStat. 3 Jac. 1, ch. 7, sec. 1, requires attornies to render bills of fees to their clients; and no action can be brought before such bill is delivered in writing to have it taxed. The Stat. 2 Geo. 2 ch. 23, (1728,) is the great statute on this subject; and all the cases cited below or here are subsequent to that statute: the decisions proceed on the ground that the fees are regulated by law, subject to be taxed; and the courts of equity ought not to enforce any contracts in relation to them. (2Atk. 27; Ib. 298; 2 Vesey, jr. 201-3; 1Vesey Beame 126-7.) This matter of fees stands on very different grounds in the State of Delaware. The right to contract for and recover fees is a legal right, capable of enforcement. (Smith E.Davis vs. Walker's adm'r., 2 Harr. Rep. 125;Stevens vs. Monges, 1 Harr. Rep. 129.) In England, physicians' fees stand on the same ground, (4 Term Rep. 317,) yet physicians have often recovered here. (Sykes vs. War's,adm'r.; Same vs. Graham; Same vs. Cooper; Same vs.Harper.) In these cases the defence was set up and yet a recovery was had.
The question then is, broadly, whether in Delaware parties shall not be permitted to make their own contracts with their attornies and counsel; whether there is any policy to prohibit it; or other reason why courts of law and equity shall not enforce a fair contract between counsel and client. I admit, that if any thing of fraud or oppression appears, it would vitiate the contract, and a Court of Chancery would relieve against it. But where the contract is not so vitiated, it imposes a legal liability; the services of counsel are recognized as forming the consideration for a promise. When once settled that such services are an adequate consideration for a legal *Page 162 
promise, such contracts must be enforced in any court having jurisdiction of the subject. There cannot be one law for the courts of common law and another for courts of equity.
It is for the advantage of the client to allow of such agreements. Such services cannot be dispensed with; the law does not and cannot settle the amount of compensation, and if parties cannot be permitted to agree upon it themselves, it must be left to the decision of a jury in all cases, or not enforced at all; and the profession will be driven to exact payment in all cases in advance. This would be manifestly against public policy.
The right to contract for a fee being established, the contingent nature of such fee cannot affect the question. Throwing out now the idea of champerty, the mere contingent nature of the fee cannot make that unlawful which would otherwise be lawful. That provision in this contract was manifestly for the benefit and ease of the client.
In the English cases the principle of their decisions is not to disallow the attorney all compensation; though they repudiate the contract as against public policy, they still allow the attorney his full legal fees. (3 Ves. Bea. 175; 2 Atk. 298; 1Ves. Bea. 126; 18 Ves. jr. 120.) But the chancellor here has dismissed the complainants' bill and refused him any relief.
3d. CONSTRUCTION OF THE CONTRACT AND PERFORMANCE. — Having thus considered the objections to the enforcement of this contract, I proceed to examine as to the services of Mr. Bayard, and his right to compensation according to the contract. I contend that Mr. Bayard rendered a full, substantial compliance with his contract and performance of it in all the Amelia Island cases, and thus entitled himself to the one full third part of the avails of those cases. After such a lapse of time (twenty-five years,) it is difficult to produce full proof of these services; especially after the death of the parties, the judges before whom the cause was tried, and almost all the contemporaries. The answer of the defendant admits that Mr. Bayard rendered some services: — that he took part in the argument in the case of the ship "Good Friends" in the District Court: — that this case is the only one that was argued: — that the other cases, the Amazon and United States, and their cargoes, never proceeded to trial and judgment: — that the case of the Good Friends was prosecuted to judgment in the District Court; an appeal taken to the Circuit Court where the judgment was affirmed without argument, and an appeal *Page 163 
to the Supreme Court, which was abandoned; and that the case of the cargo of the "Good Friends" was not argued in the District Court. Mr. Bayard, therefore, argued the only case that was ever argued in any court on the subject matter of this agreement. This argument lastedeight clays.
But the defendant contends, that because other collateral suits and proceedings at the treasury department sprung up in relation to these Amelia Island cases, and also a controversy between Mr. McLane and the United States, collateral to and arising out of these cases; and in the conducting and argument of which cases and controversies Mr. Bayard took no part, that therefore he did not perform his contract.
What did the contract require of Mr. Bayard? 1st. As to the character of the services. Professional services as counsel; not as attorney. He was not bound to file the libels, or prepare the cases for trial. That was the duty of the district attorney, and he performed it. He was only bound to argue the cases on the question of forfeiture, whenever such argument was necessary; and also to give counsel and advice in relation to those cases. He was not bound to argue a case that never came up for argument. 2d. The object of his service's and their extent. Services as counsel of Mr. McLane in the courts of the U. S., "for the purpose of obtaining the condemnation of theproperty seized as aforesaid;" that is, seized as forfeited. The forfeiture was the object and end towards which Mr. Bayard's services were to be directed. On that forfeiture the right of the collector to a portion of the forfeiture arose, which was the object of the suits; and the mode by which the collector should receive in pursuance of the decree of forfeiture, whether by a sale by the marshall, or through the treasury department, under a qualified or conditional remission, had nothing to do with the contract. As to solicitations at the treasury, or the conducting of controversies between that department and the collector, Mr. Bayard was not bound by the terms of his contract to lend any aid or counsel.
The court will intend that the contract was made in reference to the laws of the land; and it cannot be supposed that the parties to this contract intended to bind Mr. Bayard to resist the constitutional right of the claimants to petition Congress for remission, or of the government to remit these forfeitures. (4 Laws U. S. 581.) The act of 29th July, 1813, for the remission of these forfeitures was constitutional, and was a legislative remission. (6 Peters' Rep. 411.) *Page 164 
Independently of the special act of 1813, there was a discretionary power in the secretary of the treasury to remit these forfeitures. (1Laws U. S. 217, sec. 18; 2 Ibid 585.) The special relief law in this case, passed 29th July. 1813, (4 vol. 581,) gives the same right of remission, as in the act of 2d Jan. 1813, (4 vol. 485,) which makes it the duty of the secretary of the treasury to remit. The special relief law then in the cases of the Good Friends, Amazon and United States, was a legislative remission
of these forfeitures, on terms. No discretion left to the secretary — no statement of facts necessary to be procured from the district judge. Then what becomes of the allegations in the answer, that Mr. McLane was put to great cost and expense in resisting the applications to the district judge for a statement of facts, and in resisting the petitions to the treasury department? Such resistance was useless — was directed to a futile object — was in direct opposition to a law of the land; and no aid could have been demanded or expected from Mr. Bayard in such controversies.
Again, it is apparent that Mr. Bayard was not bound by his contract to resist these applications for remission, for they were founded on the forfeiture; which forfeiture was the end and object towards which he was to render his services. The defendant has by his answer assumed that Mr. Bayard was bound to prosecute these cases, not only to forfeiture, but to a final condemnation in the court of the last resort, or elsewhere; and that this was a condition precedent to his right to any compensation. This we deny. The language of the contract is not that he shall be entitled if there shall be, or upon obtaining, a final condemnation of the property; but that he shall render his services in the courts of the United Slates "for the purpose of obtaining the condemnation of the property seized;" and, in consideration thereof, he was to have a share of what should be finally recovered "inconsequence of the seizure," and not in consequence of thecondemnation. It was then entirely within the terms of the contract, that Mr. Bayard might have become entitled to a share of what was recovered in consequence of the seizure, without any condemnation. The parties, cognizant of the law that the cases might result in a remission before the condemnation, so contracted as to give Mr. Bayard compensation for his services, even though the cases should not proceed to condemnation. This proves that his fee was not dependent on a condemnation only. The condemnation was the utmost extent to which his services could be required, but *Page 165 
it does not follow that such condemnation was actually to be had before his right to any compensation arose.
I now proceed to contend that Mr. Bayard was not bound to give his services in the suit between the collector and the United States, for his share of the double duties, paid as a condition of the remission. This case was a totally new suit, between new parties; and so stated in the answer. It was for the purpose of obtaining distribution of the avails of the condemnation; for ascertaining the share to which the collector was entitled. Was Mr. Bayard bound by his contract to aid in this suit? We say, no. Much less did his failure to do so destroy and annul his right to a share of the forfeiture, which had been earned by aiding to procure that forfeiture. Suppose a sale had taken place under these condemnations, and the money received by the marshall, and that he had made default and had to be sued by the collector. "Would Mr. Bayard in that case have been also bound to conduct the proceedings against the marshall? And would his neglect to do so have been a forfeiture of all right to compensation for his services in obtaining condemnation? Certainly not. Was he bound also to prosecute suits against all the claimants of this property, on their duty bonds? To be sure he would have had an interest in all these suits; as he had an interest in the suit of Col. McLane against the United States; and, having such interest, he was bound to bear a portion of the expenses of that suit, and would have been liable even in case of a failure; but the question is not what were the rights or the liabilities of Mr. Bayard as aparty interested in that suit; but it is whether he was bound by his contract to act as counsel in that case. The answer sets up the neglect of Mr. Bayard and of his representatives to aid in the prosecution, of that suit, as a forfeiture or abandonment of their interest. Our reply is — 1st. That they were minors. 2d. That Mr. L. McLane was also a representative of Mr. Bayard's estate; and 3d. That the suit against the United States, could have been brought only in the name of the collector, whose rights were by no means impaired by the neglect of these parties to come forward and aid him.
I proceed now to show that Mr. Bayard did render a strict compliance with his contract; and give all the professional aid that, as the matter turned out, it was necessary for him to give, for the purpose of securing the condemnation, or which by his contract he was bound to render; and that he thereby became entitled to the compensation stipulated for by that contract. *Page 166 
The "Amelia Island cases," comprised the ships Good Friends, Amazon and United States, and their cargoes. The reasonable construction of the contract and intendment of the parties, embraced the cargo with the ships respectively. The "property seized" was the ships and cargo; and, in common understanding, speaking of the ship involves her contents. The receipt produced by the defendant states that the argument was in the case of the ship and cargo. The argument in the case of the ship was necessarily an argument against the cargo. The ship was to be condemned because of the condemnation of the cargo. All the cases depended on the same grounds as the "Good Friends." The answer somewhat evasively denies this. But in the defendant's letter to R. H. Bayard of the 3d of March, 1832, he not only admits but insists on the entire similarity of all the cases, and "that to lead to or procure a remission in one, necessarily produced a remission in all." Why then would not an argument in one operate as an argument in all. Again: all the vessels came from the same place; with the same description of cargoes; all touched at Amelia Island, and all arrived in the Delaware, and were seized about the same time. They were all libelled at the same time, and in the same court. The same law applied to all. The cargoes were in nearly the same case with the ships. A forfeiture of the ship was necessarily a forfeiture of the cargo. (4U. S. Laws 212.) After the condemnation of the "Good Friends," none of the other cases were suffered to go to trial; but the claimants fled to the treasury for remission. The record entries and proceedings in all the cases, the same. The libels all but copies one of the other. Same commissions and same interrogatories and same depositions in all the cases; of course the same testimony. Same agreements of counsel as to the depositions being read in each case. The letter from J. A. Bayard to Spackman implies that they are the same cases, and returns the retainer. The ground of defence taken applied equally to all the cases. That the owners were justified by a clearance from Amelia Island, then in possession of General Matthews, under authority, as it was alledged, of the United States: that the declaration of war was virtually a repeal of the non-intercourse laws. All these grounds of defence were met and answered by Mr. Bayard, in the case of the Good Friends, and the answer equally applied to all. It was not a matter lying before a jury, in which there might have resulted a different verdict on the same state of facts; but it was *Page 167 
before the same judge; on the same facts: same law and same argument; and the decision must necessarily have been the same.
Mr. Bayard, therefore, in arguing the case of the Good Friends, did in effect argue all the cases, and did operate and produce the same result as if there had been an argument in all the twenty-four cases, and in all the courts. But by the contract Mr. Bayard was not bound to argue a case which never came up for argument; and the answer shows that the other cases never were tried. So in reference to his absence from the country. He was bound to be here only when his services were wanted for counsel or argument in any of these cases, in any court on the question of forfeiture; and he was present, efficiently aiding on all such occasions. Mr. Bayard then gave his counsel and services in the courts of the United States in these cases, whenever they were needed or could be useful.
The answer says that Girard, the owner of the Good Friends, seriously
prosecuted an appeal from the decision in the District Court. Look at the record. The entry of the appeal, the continuances and the final confirmation, without argument and pro forma, subject to the remission, constitute this serious prosecution of appeal. And Girard had all the time a remission in his pocket on which, and not on any hopes from his appeal, he relied. Mr. Bayard had by his argument in the District Court, operated a condemnation: that condemnation remained until the other side produced a change. He was not bound to meet them in any other court, until they so proceeded as to render it necessary for him to appear. As counsel in the cause he had the right to judge when, and where, and in what respects, and manner, his counsel and services would be most effectual; and when they were not needed at all; his judgment in this respect being subject to the examination of this court. If the opinion of this court is, that there was no occasion, subsequent to the decree in the District Court, on which the services of Mr. Bayard were needed in the courts of the United States, then his contract was fully complied with. The answer admits that there was no such occasion, after his argument and before his sailing to Europe. Where is the evidence that there was any such occasion afterwards ?
Mr. Bayard being such counsel and interested in one-third of the recovery, had the right to judge of the time and manner of rendering services, even to the favoring a resort to the treasury for conditional remission, if he judged that course for the interest of his client.
The amount of the fee earned by one argument instead of many, *Page 168 
which might have, but did not, become necessary, can hare no weight in construing this contract. There is no hardship in it. No part of it was to come out of Col. McLane's pocket. None of his "hard earnings," as the answer calls it, but a share of the spoil — a contingent share,earned by Mr. Bayard in the contribution of his valuable professional services, as much as by the collector in the mere act of seizure. And it was but a choice with Mr. Bayard, whether he should take the large contingent fee of Mr. McLane, or the very large certain fees offered him by the rich claimants Girard, Thompson Maris, Spackman and others.
Finally, the letter from A. McLane to R. H. Bayard, stating that "we are jointly interested in the forfeiture," (and this was nearly a year after Mr. Bayard's death,) is a recognition of Mr. Bayard's complete performance of his contract.
MEMORANDUM AGREEMENT OF 8TH MAT, 1813. — The answer assumes that the indorsement of the 8th of February, 1813, had a prospective contemplation, for services to be performed; whereas we contend that it was only a recognition of the former agreement, and of the services performed under it. Mr. Bayard was about to sail for Europe, and might never return; and, having been before that time actually engaged in all the cases, this indorsement was made solely as evidence of the interest he had in the recovery in all the cases. What is the evidence that he was retained in all the Amelia Island cases. 1st. The return of the fee to Spackman, on the 16th of May, 1812, 2d. The letters of Col. McLane to J. A. Bayard, under date of 13th January and 9th February, 1813, speak of all the cases, the last speaking of the "Tiber," another ship consigned to the same concern as those engaged in the shipments lastspring, retains Mr. Bayard and says he shall be "recompensed and interested as in the Amelia cases." But the answer states that Mr. Bayard was engaged by some of the claimants in the other Amelia cases. He was retained by Spackman, as an informer, and of course having the same interest with the collector to produce a condemnation; and he returned the fee the moment he discovered that Spackman's interest was not identical with the collector's. Spackman deceived him. He never was employed by Thompson Maris. Yet this is relied on in the answer as evidence that Mr. Bayard had abandoned his contract with Col. McLane; when he afterwards, the day before he left the United States, took care to secure in writing an indorsement on the *Page 169 
original contract, showing that it equally extended to all the Amelia Island cases.
But if it be conceded that the agreements as to the Good Friends and the other ships are distinct, it is impossible that proceedings in relation to the other ships should be an abandonment of the former agreement; and the decree of the chancellor dismissing the bill is, therefore, erroneous. The answer, anticipating this conclusion, attempts to restrict the contract to the ship Good Friends, without the cargo; and then states that nothing was finally recovered on account of the ship. The contract was for the avails of the seizure; the cargo was seized as well as the ship; and the forfeiture was on account of the ship, as well as the cargo. The acts are entitled for the relief of the owners of the ship; the decree of forfeiture was on account of both, and the amount of the forfeiture was ascertained by reference to duties on the goods, merely as a measure of forfeiture, or punishment. The decree was not for duties on goods eo nomine, but for a gross sum as penalty or forfeiture, to be measured by the amount of double duties; and this forfeiture resulted in consequence of the seizure of the ship as well as the cargo. Even if it should be doubtful how much was recovered on account of the seizure of the ship, and how much of the cargo, this court would take means to do justice; and has the power to order an issue to be tried by a jury. The contract was for the avails of the seizure, not of the forfeiture — seizure was as to the collector the title. His interest accrued entirely from the seizure. (6 Peters' Rep. 404-12; 1 Wheat.Rep. 462.)
PAYMENT OF THE FEE BY THE UNITED STATES. — Another objection in the amended answer is, that Mr. Bayard has been paid for his services in these cases. The receipt is for $500, for services rendered the United States. Does it follow that this is in payment of services rendered to Col. McLane? The U. States was interested as well as, and more than, Col. McLane. There is nothing unusual in two parties equally interested in a suit, both employing the same counsel. The U. States paid in a certain fee of $500. The collector contracted to pay a contingent portion of the amount recovered. And on the 8th of May subsequent to this payment Col. McLane, under his own hand, recognized his agreement as in full force.
QUANTUM MERUIT. — Finally, supposing that the respondent does establish before this court that Mr. Bayard did fail to perform the full and entire amount of services contracted for, it cannot be denied that he did perform some service, and valuable service, for which *Page 170 
he is entitled to compensation, and for which he ought to have had a decree. In a court of law where this case would have been, hut for the relation of the parties — in an action of assumpsit, with a declaration on the special contract and a proof of such part performance, the plaintiff would be entitled to recover compensation for his services as on a quantum meruit. (4 Bos. Pull. 355;Buller's N. P. 139; Chitty Cont. 276.) If this be the rule of a court of law, more especially is it the doctrine of a court of equity, whose principles do not favor forfeiture, but go for equitable compensation. (3 Cond. Ch. Rep. 549; 2 Sch. Lefroy
347, 684; 1 Mad. Ch. Pr. 362.) The doctrines of the law often hold a party to strict compliance, and operate hardly even to the exclusion of justice; but courts of equity hold the most liberal doctrines in favor of recovery, where equity and right require the extension of the rules which would operate at law.
Messrs. Meredith, Sergeant and Jones, for appellee: — The scope and end of this bill are for a specific performance of a contract; for a discovery of the amount of a particular fund, and for a division of that fund. In such a case, calling on a court of equity for its aid to execute a contract, it is important to inquire what is the contract; is it lawful; is it reasonable; is it fair; have the parties asking its execution entitled themselves to the active interposition of this court; have they done equity; do they come with clean hands?
There are many cases where the court will not aid to enforce
a contract, in which it would not set aside such contract.
This as a contract between attorney and client, in which the client agrees to give to the attorney one-half of a very large claim, for his services as counsel in enforcing that claim in the courts of the U. States. The lawyer agreed to render services as counsel in the courts of the U. States, for the purpose of obtaining the condemnation of certain property seized. But it is said that he was only to perform services ascounsel, and not as attorney; that he was only bound to argue the case when it came up for argument; not even to do that if, in his judgment, he thought such argument unnecessary. And we are told that an argument in the instance court, not only dispensed with an argument in both of the appellate courts, but dispensed with his services in the preparation of the cause in all these courts, and in all other arguments, in all other matters or causes, which might be necessary to make available the fruits of forfeiture and condemnation. In such a contract, with such performance, the *Page 171 
court in the beginning is asked to say whether the consideration isreasonable; whether, in reference to the eternal principles of equity and right, such is a proper contract for a court of equity to enforce.
We might also ask whether this case comes here at a time, and in a way to entitle it to equitable consideration. Mr. Bayard was retained but in one case, that of the ship Good Friends. He did but one act in performance of his contract. He received from the collector a fee of $500, for this service. He went abroad; abandoned the cases, and died. His representatives took no charge of them; contributed neither counsel nor money. It was impossible for them to contribute thestipulated service; and when called on for even a substituted performance, they refused in any way to aid in the struggle in which Col. McLane wore out his life and fortune. Now, after the lapse of twenty years, after the death of both parties, these old papers are brought to light, and a large claim founded upon them, to share the results of this struggle. The Court of Chancery has a repugnance to stale claims; and often refuses relief independent of acts of limitation. Col. McLane lived fourteen years after Mr. Bayard's death, and no demand was ever made on him. In 1813 he received one-half of the duties; in 1819 he received a part of the additional duties, yet no claim was ever set up by Mr. Bayard or his representatives until twenty years afterwards, when no one lives who was party or privy to this old contract, or who knows the views of the contracting parties. In Mr. Bayard's hands this paper might have been harmless. Having left the country without performing the service, and never returning but to die, he would never have attempted to enforce it. He knew what was honorarium, and what was capable of enforcement as a legal contract; and knowing that the object of this contract had failed, he would have been the last man to set up a claim under it.
Standing then upon the principles of a court of equity, we might stop, and not go on to show that this contract is not only iniquitous, butillegal and prohibited by express statute as a crime.
CHAMPERTY. — Here is a contract in its very terms, for the partition of the thing sued for between counsel and client, in consideration of professional services. This is champerty.
The professional aid of an attorney or counsel for his client is in itself maintenance if done by another, and would be in them, but for the express exception of the statute. Then what is champerty? It is perfectly immaterial whether done by attorney or counsel, or any *Page 172 
one else; the great feature which renders it illegal, is the division of the thing sued for.
But it is said — 1st. That the contract of champerty must be with a party to the suit. It is immaterial with whom made, if the contract made pendente lite requires a division of the matter in suit. The collector is a party in interest, and the other side are driven to extend their rule to a party of record; a distinction which does not exist, and which would amount to this, that a party in interest not of record cannot be guilty of champerty. (15 Vesey
140.)
It is said again that to make a contract champertous, the champertor must contribute to a share of the expense or costs of the suit. We shall first affirm that both ingredients are present in this suit; and then deny the necessity of the latter.
If we understand the bill and argument in this case, the court is called on to supply the ingredient which they say is essential in the offence of champerty; to make Mr. Bayard pay a part of the costs of prosecuting these suits, as a consideration for the division of the avails of that prosecution. The bill does tender that which they insist upon it is necessary to complete the champertous nature of this contract. Assisting a party by the payment of costs is itself maintenance. The arguing a cause for another is maintenance, though justifiable maintenance, by express exception of the statute. (2Inst. 563-4.) The great question then is, whether a counsellor or attorney may not only lawfully do this maintenance of another's suit, which another could not; but may take for the doing it a part of the thing to be recovered. Instead of excepting the lawyer, the policy which repudiates such contracts is stronger in his case than any other. The mere purchase of the thing in dispute pendente lite is champerty. (2Inst. 563.) Even a bond to convey, after suit determined is void, as tending to maintenance. (15 Viner's Ab. 171,sec. 2; 8 Johns. Rep. 479; 13 ib. 289; 5Johns. Ch. Rep. 44; 5 Comyn's Dig. 22-3, (1619;) 11Mass. Rep. 549; 1 Hovend. on Frauds 54-5-6.) This is a purchase of the thing in dispute, pendente lite; and the consideration of this purchase is the illegal maintenance of a suit; illegal, because of the mode of compensation.
It is said also that this objection does not apply to the case of a public prosecution; a case which of all others ought to be kept clear of the sordid interests and passions of those who have the conducting such prosecutions. The case of Stevens vs. Bagwell, (15Vesey 140,) was the case of a public prosecution. *Page 173 
We are also called on to notice a distinction between attornies and counsel. As to the former, it seems to be admitted that, on some idea of fixed fees, they are not at liberty to contract with their clients for anything beyond their fee, and of course not for a part of the thing in dispute. In this country there is no distinction in the common law courts as to the character of a lawyer; attorney at law is the general term; the only character in which he is known; and he is acting as much in that character when he gives counsel or advocates causes, as when he pleads on the roll. But we deny the distinction contended for as to the offence of champerty even in England, where distinctions in the grade of lawyers do exist. (2 Inst. 564; 15 Viner 171, sec. 3.)
We are next told that this law of champerty is not the Delaware law. We look into the statute laws of this State and find that the act in force at the time of these transactions, refers in its terms to the common law and the several statutes made against such offences in England. (1 Del. Laws 239; 15 Geo. 2; An. 1742.) The act of 1826, (Dig. 138,) varies only from the old one in affixing a penalty for the offence. This act also refers to the common law for the definition of the offence, and the common law of England is the common law of Delaware. But it is said to be a uniform practice of the profession, here, of attornies as well as counsel, to contract for a part of the thing in suit, as a compensation for professional services. But usage, however it may be matter of evidence, does not make, at least cannot repeal, express law. The practice may not have come under judicial notice heretofore.
Again we are told that the law of champerty arose in ancient times, and was made to suit a state of society different from the present; when public as well as private persons were in the habit of corrupting the administration of justice by the practice of champerty. If such practice is, by the improvement of the times, almost unknown, so much the greater is the necessity of enforcing the law, when it does in fact happen. Modern courts, so far from restricting the law of champerty, have given it a very extensive application to cases standing in the same policy,
and even tending to champerty. (3 Ves. 494; 15 ib.
140; 18 ib. 125; 7 Dowl. Ry. 846,Bell vs. Smith.) In this State the question does not appear to have been made, but it has been decided in several of the sister States. (6 Mass. Rep. 418; 7 ib. 76; 11ib. 549; 1 Pick. 415; 1 Ohio Rep. 132.) It is just as fatal to a case in a court of equity called on to enforce a contract, that it *Page 174 tends to champerty, as if it was legally champerty. It is the watchful business of: that court to discover cases standing within the same mischief, and to refuse its aid to the enforcement of such contracts, as if it were the prohibited case itself. (3 Ves.
494, 500, 18 ib. 125: 2 Atk. 226; 1 Eq. Ca. Ab.
86; 15 Ves. 140; 3 Ridgw. 500; 6 Ves. 266; 9ib. 292; 12 ib. 271, 372; 15 ib. 334; 1Stevens 303.)
ATTORNEY AND CLIENT. — Supposing the contract not void for champerty, or for its tendency to champerty, the next objection to the recovery on such a contract grows out of the relation of the parties as attorney and client.
This case would not have been listened to in an English court of law, much less a court of equity. In that country of privileged orders, no case has occurred where such a contract as this, as between attorney and client has been executed by the aid of a court. It is a question between the bar and the public. The law of Delaware authorizes a competent number of honest persons, learned in the law, to be admitted as attornies. (1 Del. Laws 132, sec. 26; Dig.
103.) The bill of rights, (Const. art. 1, sec. 9,) provides that every man shall have justice "without sale, denial, unreasonable delay or expense." The attornies are a part of the machinery of justice; they are officers of the court. "Withoutsale or unreasonable expense." Whom does this refer to? Not the judge. Such things do not happen now a days. To the clerks? They have no justice to sell; they sell writs. It applies then to the lawyers; those officers who do and may charge for their share in the administration of justice. The court then will so construe this constitutional restriction as to give it effect; and see that these officers do not sell justice too high. In some States their compensation is fixed by fees. Here it is not so; but it is left to what is areasonable compensation. Whenever their bargains with their clients are brought before a court, that court must see that the contract is reasonable. The oath of the attorney covers the clause itself; the lawyer swears that so far as regards himself, his clients shall have justice without sale, denial or unreasonable delay orexpense. The lawyer stands before the court as the representative of the client; when he comes as a person entitled to a share, he deceives the court by coming in a false character. In England he could make no bargain with his client; here according to the decisions, he may make a bargain for a reasonable compensation; but the court and jury are to judge of the reasonableness of the compensation demanded. The lawyer is bound to render his whole *Page 175 
service for a reasonable compensation; if by a contract for more, he undertake to do more, he either deceives his client, or intends to deceive the court, and to do something out of his duty.
A contract pendente lite, by which the client assigns to his two counsel two-thirds of the large sum in controversy, is such a contract as a court of equity, exercising the high and delicate functions of a court of conscience cannot enforce. An attorney cannot purchase of his client, or take a bond for effecting a purchase from his client; cannot in fact make any obligatory contract at all, out of the usual routine, whilst that relation exists. (1 Cox cases 112; 1 ib.
134; 6 Vesey 266; 9 ib. 292.)
And what is the answer to all this? Merely the distinction between officium ingenii and officium laboris; between attorney and counsel, without any case to support the distinction, or any reason for a distinction in principle.
This is not to be taken as a mere technical rule, but a great rule of public policy, applicable equally to all this class of cases, and founded in the clanger of influence by persons standing in these relations of the attorney or counsel over his client; the guardian over his ward, the trustee over his cestui que trust, c. (13Vesey 105; 20 Johns. Rep. 386; 1 Ohio Rep.
132; 1 Pick. 415, Thruston vs. Percival, 11Mass. Rep. 549; 5 Johns. Ch. Rep. 44; Arden
vs. Patterson.) The malign influence existing in the attorney, increases with every step as you go upward to solicitor and advocate and counsel; and magnifies itself immeasurably when the same person unites all these characters in his own person.
It is not necessary to avoid a contract that it should be liable to any imputation of fraud, oppression, or deceit; the authorities all show that the law makes these contracts void per se, as much so as a contract between husband and wife; and on the same principle, the supposed prevalence of a predominating influence which destroys the power of contracting. We are not then bound to show, that this contract is unreasonable and unconscionable in its terms, under any view that can be taken of it. Yet we maintain and take on ourselves to show that it is unreasonable and unconscionable upon views the most favorable to its support. Diminish the amount of compensation as touch as possible — enlarge the idea of services rendered or contemplated to be rendered to the utmost possible extent — and it is still unreasonable and unconscionable. But take the construction of the other side in reference to the services which Mr. Bavard was bound *Page 176 
to perform — a construction which they are obliged to make — and the unreasonable and unconscionable, character of the contract is still more striking. An aged man. distressed and harrassed by his responsibility growing out of these seizures, going to a distinguished lawyer and statesman to support him in these trials: trials where he had wealth and power, and public opinion, and an array of counsel against him; it was precisely the case where the counsel had the power to oppress such a client. The contract in terms relates to the ship Good Friends; the construction of the other side extends it to the cargo also, and to all the ships and cargoes. It stipulates for one-half and then two-thirds of property valued at eight hundred thousand dollars. It was written and kept by Mr. Bayard. What was to be the service? They say Mr. Bayard was only to act as counsel: that all the cases depended on one, and the service of one extended to all. It then follows, that no service was rendered in the case of the cargo of the first ship, nor of either of the other ships or cargoes. But their argument is, that Bayard was not even to follow up the first case by any forensic services; he was merely to act as counsel: that though this case went to and was to be tried and discussed, on all the points, in two other courts besides that in which he did argue it, he was not bound to follow the cases there. It is not pretended that he did follow them there; and they are driven to contend, that this reasonable contract did notbind him to do any thing even in that one case in either of these courts. His compensation for this was to be one-third of near half a million! But they say this was contingent. How doubtful? Mr. Bayard in two letters says there was no defence against the forfeiture; that the cases were too plain for any hope of resistance. They also contend, that the slight service contracted for so completely terminated with the first argument in the first cause, that Mr. Bayard was at liberty not only not to act thereafter for the collector but against him, and solicit remission at the treasury under employment from the other side. Is this contract reasonable? and, if Col. McLane consented to it in this view, is it not apparent
that he was misled, or that he was oppressed? There can be no other solution of such a sacrifice by the client than that he misunderstood his own cause. He had magnified its difficulties; trembled under his own responsibilities; and, as in a desperate cause, gave up two-thirds of a magnificent fortune to secure the balance. He was not properly instructed in the amount of service required: he had no idea this condemnation could he procured by one *Page 177 
argument, and the counsel was bound to tell him this. He was bound to tell him, you are in no danger of losing this prize by want of condemnation; all you have to fear is remission. And yet we are told the contract was only to procure condemnation, and not to resist remission: that Bayard could even solicit remission for the other side, and yet claim compensation from Col. McLane.
Test the compensation by several considerations. The nature of the cases — all libels depending as they say on the same grounds of principle and fact: so much so that Mr. Bayard was obliged to give up his fee to Spackman: causes in which he was bound to make but one argument in the District Court in a case which he pronounced in his letter to Mr. Eodney to be too plain for argument; — presenting not a hope for the claimants. In such a case the complainants say Mr. Bayard was not bound to render any assistance in the preparation before argument, nor in the stages subsequent to the first decree of condemnation. How was the case benefitted, in reference to the interests of the collector, by the decree in the instance admiralty court? Two appeals lay from this decree, in respect to which the sentence of the District Court could have no effect. In the Circuit Court the cause might have been tried on entirely new grounds; and on newevidence; which it is competent for the Circuit Court to take. (3Dal. Rep. 87, 119; 5 Cranch 231; 3 Wheat.113; 6 Ibid 194; 1 Cranch 110; 5 Mass. Rep.
376; 3 Pet. Rep. 57.) In these very cases commissions were moved for in the Circuit Court. Yet Mr. Bayard did not appear there. They ask us to assume that he was not there because no argument took place, and therefore it was not necessary for him to be there; but we had as well assume that no argument took place there because he was not there to make it, and therefore that he neglected it.
Have we not then here made out in fact a case of the exercise of that dangerous influence arising from the relation of the parties to this contract; an influence the very danger of which the policy of the law says shall avoid all such contracts. The case in, hand furnishes the strongest illustration of that policy. Stevens vs.Bagwell before cited, on the ground of champerty, is also in point on this subject of avoiding a contract on account of its unreasonableness. (15 Vesey 140.) And that, was a case where these predominating relations did not exist. A prize agent; had to employ the most eminent counsel; Sir Samuel Romilly and others; was to have twenty per cent, of the amount recovered; and this contract, independent of champerty and *Page 178 
other objections, was declared void for its unconscionableness and "unreasonableness.
CONSTRUCTION OF THE CONTRACT. — We proceed to the consideration of what this contract really was, with a view to ascertain the rights and liabilities of the parties; supposing a contract to exist, and that it is not illegal and void.
The rule of construction must be the same on both sides and in reference to all parts of the contract. If the services are to be restricted the source of compensation must be restricted. If an argument in one court is to be regarded as a "substantial" performance by Mr. Bayard of his contract to render service in the "courts" of the U. States, then the proceeds of the ship will remunerate him for arguing the case of the ship. Indeed the construction of such a contract ought to be most favorable for the client. Drawn by the lawyer; with a man in distress; the lawyer cool, unembarrassed, knowing more of the case than the other; the client embarrassed by his ignorance of the case and his fears of his consequences; magnifying its difficulties; unlearned in the force of terms, and altogether in the hands of the attorney. Such contracts should be construed most favorably to the client, or he would need a counsellor against his counsel, a protector against the man to whom he runs for protection.
The body of the contract is to be found in the three papers, and there can be no resort to anything else to ascertain what is the contract, its terms and requisitions. There is no latent ambiguity in it. (1 Johns. Ch. Rep. 289; 1 Ves. Bea. 526; 13Ves. 25.)
What then is the true construction of this contract? It is clear that the contracts of the 21st and 22d April, 1812, concern the ship
Good Friends alone. It recites the seizure of the ship Good Friends. The court is now called on to insert the words "and the, cargo," which the terms of the agreement do not embrace. Why extend it to the cargo? What evidence is there that the parties understood that it should extend to the cargo? They say the ship contains the cargo, et omne magis, c.; this may be; the ship contains the cargo and it may remain there; but the argument must go further, and show that thecontract contains the cargo, which it does not. How is the bill as to this matter? It only extends the case to theship. The condemnation is stated to have been of the ship "Good Friends," not the cargo. "The argument against the ship, c." And they were forced to place it on this ground because, if the first agreement covered the cargo, the services under it were paidfor; and the extension *Page 179 
of the agreement by the subsequent ones were executory and without consideration. From the ship nothing was ever recovered. The answer to this is an argument. They say the influence of the argument in case of the ship resulted to the benefit of Mr. McLane, by its influence on the cargo, and in the other cases. Is this a consideration? The influence of the argument was paid for, remote and collateral, as well as direct. The next step in the agreement in which the court is asked to change it for the benefit of the collector is, that they shall confine the services to that of a counsel, as distinguished from an attorney, though in this State there is but one grade in the profession. The character of the services are not only to be restricted, contrary to the agreement; but their extent is to be restricted to one court, and that the instance court, though the agreement stipulated for service in thecourts of the U. States. The plain meaning of the contract was to render every service in the courts of the U. States which the nature of that service required; attorney; counsel; solicitor; proetor; whatever was to be done in the courts "for the purpose," c, was stipulated by the contract to be done. However important an argument may be, there is no step in the progress of a cause, that is not important; and with the best argument in the best cause, the cause may be lost for the want of attention to the least of all these duties in the course of its preparation. The end to be obtained shows the character of the services stipulated for. "For the purpose of obtaining condemnation." What are the means? Libels; rules; motions; interrogatories; argument; all which contributes to the end proposed.
The services stipulated for were productive services, in the way of final condemnation. That is the understanding of every engagement between counsel and client; it is the obligation implied by the attorney's oath, to be faithful to his client. It excludes every act that will be prejudicial to the client, and includes all acts that will be beneficial. It is the universal understanding of this relation, as much so as the covenant of fidelity in the marriage contract. What did Col. McLane employ Mr. Bayard for? To prosecute to profitable results and final condemnation the suits of his client; that was the end and object, and whatever means were necessary to that end, he was bound to use. He was not only bound to do all that was necessary for the benefit of his client, in the course of the cause; but toprevent every thing being done which would prejudice the client, and which he could in the regular course of practice prevent. No *Page 180 
service too high; none too low; for there is no service which can be required of a lawyer that is too low for any lawyer, however elevated his standing: for it is his duty. And we find that these very services were rendered by C. A. Rodney and other eminent counsel. Final condemnation, and its fruits; nothing short of it is available to the client. What was the condemnation in the District Court, to Mr. McLane, any more than the libel or any other step? It was barren to him; useless. The service stipulated for was a whole service; reaching to the end; and useless if stopping short of that.
Instead of paring down the requisitions of this contract, they are to be fully enforced. If Mr. Bayard was absent on any one occasion when his services were required, and Mr. McLane had to supply his place with another, it would be a forfeiture, ipso facto, of all compensation under the contract. What was the service rendered? None. The argument made was paid for, Mr. Bayard says so; it was useless, Mr. Bayard says so; for he says that no man could make an argument on the other side. But what was it at last? The argument lasted eight days, and there were six counsel engaged; one tithe of the labor performed by one counsel in this cause. And yet this is said to be the end. How? does the contract say so? does it make an end at the District Court? at the Circuit Court? at the Supreme Court? No! the end was final condemnation; fruitful condemnation. No service was then performed by that argument; no such service was needed; the case argued itself; defence was hopeless; the only service necessary was attention to the cases, and urging them through the courts to final condemnation, and this is the very service he did not perform.
Viewing the case in reference to the performance of the service; the earning of compensation; it is odious in the sight of a court of equity. The case of the navy agent; the Ohio case; Penrose's case; are all meritorious cases compared with this.
Again: the consideration was personal services, and just in proportion as the other side elevate the character of Mr. Bayard; his weight and influence in the conduct of the cause; just in, the same proportion do they make it necessary that such services should have been rendered. Personal service could not be substituted; and if it could have been, was not substituted by Mr. Bayard or his family. Was Mr. McLane to employ other counsel? The service of counsel was necessary to attend to the cause; such counsel were in fact employed by Mr. McLane to perform these very services which *Page 181 
Mr. Bayard was bound by his contract to perform. When Col. McLane gave to the family of Mr. Bayard the opportunity of pertorming his contract by substitute, which otherwise they had not, they refused or silently neglected to do it.
As to the memorandum of May 5th, 1813, if it form any contract at all, it for the first time extended the contract to anything else than the skip Good Friends. Both these contracts have reference tofuture services: are executory in all their parts. Even the memorandum of 8th May is executory. "I agree, (not have heretofore agreed,) that the arrangement shall apply to the other cases. Is not this future; prospective; executory. And where is the consideration for this? By the statute of frauds the consideration must appear from the terms of the contract.
But this memorandum forms no agreement. It was a mere offer, never accepted by Mr. Bayard, nor acted on. It never bound him, and therefore never bound Col. McLane. (1 Fonb. 11; 3 Carr. Payne 289; 2 Vern 401; 2 Powell Cont. 233; 1Eq. Ca. Ab. 20.) How does it appear that Mr. Bayard was bound by the indorsement of 8th May, 1813, to do anything? If he was not bound Mr. McLane was not bound, and as Bayard did not sign he was not bound, unless it is shown that he accepted the agreement, or performed it in the whole or part. Now how does the assent appear? As to performance, that is out of the question, for Mr. Bayard went to Europe the clay after. The bill does not alledge any assent; nor is there any proof of any. Pressed by the force of these views, the complainants are driven to treat this indorsement as the recognition of a precedent agreement, and not merely as the making a new agreement, or the extension of an old one at that time. But the first contract stands on its own terms, which do not go beyond the case of the ship Good Friends; and the argument made under it was compensated by the fee from the U. States. The receipt for that fee is not true, if it was not in full for that argument. Then is this a contract at all? We do not ask now if it be a valid contract; if it have a sufficient consideration; if it be not vitiated by illegality; is it a contract at all? Where is the mutuality? Where is the slightest obligation on Mr. Bayard to accept the agreement, or any evidence or even allegation that he did accept, or did perform? (2 Vern 410; 2 Powell Cont. 233-4; 3 Carr Payne 289.) Then what is the contingency upon which the compensation to Mr. Bayard was to become due? The final prosecution of the cases to an available result; and the only source *Page 182 
of such compensation was the fruits of such prosecution, the matter realized in consequence of the seizure, andprocured by the efficient prosecution of Mr. Bayard.
The terms — "to render service for the purpose of obtaining condemnation," c, "and in consideration thereof to have one-half of what may be finally recovered," c. The contingency iscondemnation; the source is recovery. Recovery how? in invitum; by judicial sentence or decree; not what may be recovered by compromise, or granted by other proceedings: —final recovery, not merely a condemnation by the first
court, nor yet by the last court; but a final recovery and receipt of the fruits. Money cannot be said to be finally recovered, when the right to it is established merely; it must be received. If the contingency is final condemnation, it follows that the source is the fruits of final condemnation.
PERFORMANCE. — Then what is the performance in the whole or in part (protesting that a part performance is insufficient.) What was the obligation of Mr. Bayard? To be with Col. McLane in all the courts of the U. States; to sustain and support him. He was not there. But say. they, all was done by one argument? We do not believe it. With all respect for a good argument, we have a, greater respect for the opinion and word of Mr. Bayard, who says that the caseargued itself. (See letters to Rodney and Spackman.) And how can an argument be said to cause a condemnation? Impossible to prove it. It is the law and the judge who administers the law, that causes the results; an able argument may save trouble to the judge in investigating the cause; may even enlighted him; but how can it be said to cause the judgment.
We are here then at issue on the question of performance. Is there any case on this subject in which there has been any dispute about the performance by the counsel of the service? not one: from Penrose's case down, the performance has been admitted. But they say the attorney is to be the exclusive judge of his services: is that in the contract? And admitting that he was to be the judge when his services were needed; the contract did not invest him with a prophetic power of judging when his services would be needed. He went abroad: he placed it out of his power to judge of the necessity, even if we would in construing a contract violate the first principles of justice, that no man shall be the judge in his own cause.
But we have not only this want of the performance of the contract, such as it was; but we have an equally forced extension of that *Page 183 
contract from one ship; first, to her cargo, then to two other ships and their cargoes: all of which are to be embraced within this excusefor non-performance. "He went abroad expecting to come back and render the service stipulated for." Granted. But he never did come back, except in a dying condition, and never did render the services. Then where is the equity?
Did he prosecute these suits? How came they to lie torpid in the courts from 1812 to 1832? Was he performing his contract during all this time? Did he urge the cases whenever they ought to have been urged? Did he make and resist all motions necessary to be made or resisted? Not one. During all the time he was in Europe, or in his grave.
We are not admitting that had he rendered all the services required by his contract, and in due time, that he could have recovered on this contract at law or in equity. We think it clear he could not. But supposing such a claim capable of legal enforcement, if it could be shown that the attorney had on any one occasion neglected his client's cause to that client's prejudice, it would be an insuperable bar to his recovery. Here there was not only no service rendered by Mr. Bayard, subsequently to his going to Europe, but for the only service rendered before that, he waived the contract and took pay for it from the U. States. What was the value of that service to Col. McLane. The argument is, that by that argument he not only produced the condemnation of the ship Good Friends, but produced the decision in all the other cases. Yet his contract was to make that argument for one-half the result of the ship Good Friends. Granting then that the argument in that case produced the condemnation of all; he has his reward under the contract; one-half the proceeds of the ship. Suppose him to have said to Col. McLane afterwards, on the 8th May, 1813, when the memorandum agreement was made, "all the cases will be decided by the argument I have made, and I ask you to give me one-half of all these ships and cargoes, amounting to half a million;" would Col. McLane have done it? Suppose he had not told him, but induced him to suppose the other cases stood ondifferent grounds, and thus induced him to make a newcontract. How would this do for an equitable and meritorious consideration for a contract; and that too where no service was ever rendered under that contract? But Mr. Bayard has placed his own estimate on the labor and the difficulty of this argument. He says *Page 184 
not a ground existed on which to rest a legal defence. What a case is this for the equitable demand of a quarter of a million as a fee?
There is strong ground for arguing not only that there has been no full performance, but not even a part performance of this contract. The only act of performance relied on is the argument in the District Court. Was that argument in pursuance of this contract? What is the evidence of it; for on this question of actual performance, being a fact lying in parol, it is to be proved or disproved by parol. For whom then or under what contract did Mr. Bayard, make that argument? His receipt to the collector for $500, received from the United States; his letters to C. A. Rodney and Spackman, show that he considered himself as acting exclusively as the counsel of the U. States, and that he actually received pay from the U. States, in full for that argument. Mr. Bayard was retained by the U. States, to make this argument. All that he could do as a lawyer he had bound himself by his oath of office to perform, without any reservation. Then could he do any thing for Col. McLane, under his contract with him, which he was not bound to do in the same case for the U. States? He was employed by the U. States to procure condemnation. That was what he contracted to do for Col. McLane. Every service that he could do for Col. McLane, he was bound to do for the U. States. And they even argue on the other side, that when these interests came into collision Mr. Bayard was bound to take the side of the U. States; (for they say Mr. Bayard was not to resist the U. States' right of remission.) Then what reserve of service had Mr. Bayard to sell to Mr. McLane, and what consideration could he offer for this contract. The service; eight days of argument; for whom? The U. States; so stated, and so paid for. How does this form a consideration, to support the contract with Mr. McLane. If this be relied on as theconsideration, it was a consideration known to the lawyer to be worthless. So the return of Spademan's fee is no consideration. Bayard was already retained by the U. States, and the service was inconsistent.
Mr. Bayard elected to serve the U. States and not Col. McLane. But the case assumed the shape of a controversy between Col. McLane and the U. States, in which he was bound by his contract with the U. States to take part against Col. McLane; and yet we find his representatives claiming; to share the results of this controvery with Col. McLane, on the consideration of services renderedhim.
THE GROUND OF EQUITABLE REMEDY. — There is no ground taken in *Page 185 
resistance of this claim that would not have been equally strong at law; and e conrerso. there is no ground upon which the claim is sought to be enforced which a court of law would not be competent to try and fully to determine. No bill can be entertained for the specific performance of a contract which requires a personal act to be done by the party. (2 Stores Equity, 74; 1 Mad. Ch. 402,) The title to specific performance must be mutual to each party; and if the court cannot enforce specific performance against both it cannot against either. The absence and death of Mr. Bayard destroyed this mutuality. (2 Story's Eq. 29; 1 Mad. Ch. 423-4; 4 Russ.
298; 1 Johns. Ch. Rep. 281, 373.)
The single reason that this cause is in equity and not at law, is that Mr. McLane is one of Mr. Bayard's executors and cannot sue himself. The bill is for a specific execution. In the "whole bill there is no ground of equity set up: the only matter is a legal right thrown into equity jurisdiction. The complainant is then standing as at law. How would he stand at law, in an action of covenant or assumpsit? He must have averred performance. Suppose he had stated his appointment as minister, and absence in Europe; this Would have been fatal to him. Suppose he averred "substantial porformance" — that would not do, unless it is actual performance, which it is not. Suppose him to aver that he argued the cause in the first court, and then left it with associate counsel in all the other courts; this would not do. His contract bound him to render his
services in all the courts. And his abandonment of his client's cause might have rendered him liable as for a breach of his contract. Death, to be sure, would be an excuse for non-performance; but it would not give a right of action as for a performance, either at law or in equity. The bill nowhere asserts that Mr. Bayard actually performed his duty under the contract; and we submit that the allegation of performance should be as positive and full in a bill in equity, as in the action of covenant or assumpsit.
This is a case of mutual covenants going to the whole consideration, and therefore a condition precedent. The right to compensation vests only upon the performance of the condition, and not earlier. Mr. Bayard was entitled to nothing until full performance.
"Services to be rendered in the courts of the U. States," — that was the condition in the contract of the 21st of April. The memorandum of the 8th of May, 1813, has the same reference to prospective services; and though invalid as an agreement, it affords a construction *Page 186 
to the first agreement to which it expressly refers, and it establishes, that there were services yet to be performed under the first agreement. It is in Mr. Bayard's writing. It speaks of all the agreements as then existing, and having a prospective operation. Mr. Bayard shall render in these cases the same service which he is bound to render in the case of the ship Good Friends. But all the service he ever rendered was done before this, and if there was any thing yet to be done in the first case, the condition precedent to any compensation in that case had not been, and never was performed. The case of the Good Friends was thenpending in the Circuit Court; something was yet to be done to procure condemnation even in that case, and Mr. Bayard had contracted to render service in all the courts of the United States to procure condemnation, and this as a condition precedent to the right of any compensation. In this state of things, the same parties agreed that on condition of Bayard's performing the same services in these cases which he was bound to perform in that case, he should be compensated in the same way. This was a written admission by Mr. Bayard, that his services in the first case were not yet performed.
Has this condition ever been performed? Mr. Bayard left the U. States on the 9th of May, 1813; remained absent two years and three months and died, these causes still pending. During his absence he could render no service, and did render none. Then how could he ever have performed the stipulated service in any of the Amelia Island cases, all of which were brought forward, by the written admission of Mr. Bayard, in an unfinished and pending state, up to the 8th of May, 1813?
But say they, Mr. Bayard's services were not wanted in the Circuit Court. Is that any answer? Does that establish a performance on his part? The undoubted meaning of this contract was, that Mr. Bayard should have the care of the case to the end, and that Mr. McLane should not be put to the expense of employing others which he did, Mr. Eodney, Mr. Ingersoll and others, to do the services which Mr. Bayard stipulated to render. Mr. Bayard had no right to go abroad without Col. McLane's consent, and the doing so deprived him of his services and violated the contract. He abandoned the contract; he waived all the benefits under it. Was any thing to be done after he went away? The case was placed in a critical state almost immediately after he left. Col. McLane protested against the government remission. This raised one of the most important and *Page 187 
difficult questions ever agitated; and it was not settled until 1823, in the case ef the U. States vs. Morris. This question involved the whole right of the collector, in the whole interest under the seizure. It was said for complainants on the first argument, that if Bayard had been here, he would have advised against that protest. Then Col. McLane was entitled to such advice, and it would have been a great service if it had been given and followed. Again on the question of affirmance in the Circuit Court of the condemnation of the District Court, the whole interest of the collector in the whole seizure was brought in question. Who can say now what took place then? The record says it called forth argument; the bill says it required an agreement of counsel; in either case the service of Mr. Bayard wasnecessary, and was not rendered.
Incapacity to perform the service however produced, puts an end to the contract from that moment. It is no answer to say that the case went on without the service, any more than it would have been inCutter vs. Powell, to say that the ship went on without the mate. The service must be rendered as a foundation for the claim for compensation. The incapacity to render the service effectually, puts an end to the contract as the basis of any compensation. Evidence of want of Mr. Bayard's services in the Circuit Court. June term, 1813 — entry of appeals; Read, counsel for the U. States; Rodney, Vandyke and Read, jr., for Girard. October 24, 1815 — causes of appeal filed: no less than four new commissions issued to take depositions: new causes of appeal filed. June term, 1818 — counsel for the II. States,George Read, jr., and Ingersoll; for Girard,Rodney, Vandyke and Read. Sept. 29, 1818 — Decree of affirmance, c, "after hearing advocates and counsel." Appeal prayed and granted from Circuit Court to Superior Court. Oct. term, 1822 — Motion of C. A. Eodney for Col. McLane, and agreement of counsel filed. Under the suit arising out of this agreement, the avails were recovered. In the District Court, Read was district attorney; and on the side of the collector. Read, jr., was counsel for the claimants: after the appeal, Bead, jr. was appointed district attorney, his father having resigned, and Eead, sen., went over fromMcLane to the other side, and his case was left to the prosecution of Eead, jr., just fresh from the ranks of the enemy. Where was Mr. Bayard then? Was he not needed to attend to these cases toprocure condemnation, which was not yet procured; to obtainrecovery, which was yet to be sought. He was away; his client's cause left to the prosecution of a cold and *Page 188 
indifferent friend, in whom the collector had no confidence, as appears from the exhibits. But Mr. L. McLane was left to take care of the cause." Is this any answer; is it any excuse for the neglect of Mr. Bayard? He had engaged to unite his services with L. McLane, that the two together should do this service and not one alone, much less that one who is not the person claiming compensation for the performance of the service. New counsel was employed by thecollector! Yet it is now claimed that Mr. Bayard shall be paid for the service not rendered by himself, nor by his colleague; and not performed by any other until after his death. Col. McLane was left then for a time mops consillii; he did not trust the cause to his son, whom the bill calls a very young man; he went to Philadelphia and employed Mr. Ingersoll to do the duty. "After hearing advocates and counsel" in the Circuit Court, the appeal was decided and the decree of the Circuit Court was confirmed on terms. This, without proof to the contrary, is conclusive. It is not a mere formal entry; not the usual entry, unless such is the fact. But whether argued or not, it was a casecontested; one in which the presence of counsel wasnecessary.
But condemnation was not then procured; it was instantly appealed from. Neither did it confirm the sentence of the District Court; on the contrary it in effect reversed that sentence. "Affirmed to be released on payment of double duties." Is that an affirmance of the decree of the District Court, which was unconditional? It was a mere pro forma affirmance, with a defeazance.
How were the collector's interests involved in this decree? He had before resisted the right of the government to remit his share of the forfeiture. The form and character of this decree involved the question whether, by the act of remission, the government had the right to cut off the greater part of the collector's interests under the seizure and the propriety of the court making this qualification to its decree. Yet Mr. Bayard was not there to render service on this question, to procure condemnation; absolute and not conditional condemnation. And undoubtedly if he had been there, he would have prevented that decree; for it was the duty of Mr. Girard to plead the remission as against the decree. This question of the government's power to remit, was not decided finally until three years after Girard paid the money.
But this decree of the Circuit Court was instantly appealed from. It never had any operation as a condemnation; it went into the Supreme *Page 189 
Court, and no condemnation was there made. Girard paid the money, performed the condition upon which condemnation wasremoved, (the Circuit Court condemnation) and prevented the possibility of final condemnation.
What was the operation of the decree in the Circuit Court? It was in effect a reversal of the District Court's decree. An affirmanceto be released on terms; as to the ship Good Friends,without terms. The decree was a reversal as to that ship. There was no longer any condemnation as to her. The operation as to the cargo was the same thing. The condemnation reversed; no right remaining to the U. States or the collector out of the condemnation, but a reservation out of the remission. Then came the struggle of Col. McLane to resist this remission, in which he needed counsel. The appeals to the Supreme Court were never prosecuted to condemnation, hut remained subject to the remissions of the secretary of the treasury, under the act of Congress. But Congress had the power to remit all; and what they reserved was granted to the collector, as they could have taken away all. What was received then finally, was not received under seizure, forfeiture or condemnation, but by grant under the act of Congress. In the construction of this act, a suit arose between Col. McLane and the United States, which was first decided against him and then in his favor, without any aid from Mr. Bayard. The recovery then was not only not by virtue of any service rendered by Mr. Bayard, but against his influence and services in, procuring remission.
QUANTUM MERUIT. — We come then to the point, whether it is proper for this court to send an issue to law, and for what?. It is reversing the order. They came into equity for want of remedy at law; they now ask to be sent back to law for want of remedy here. But the question is first, whether there is any right of recovery on the contract at law or in equity. They set up a contract; services under a contract; they treat it as in existence; and was it ever heard that whilst setting up a contract, the party could recover compensation otherwise than under the contract. (3 Pick. Rep. 235; 3Atk. Rep. 124; 1 ib. 2; 2 ib. 3; 1 Vesey,jr. 426; 13 ib. 114; 13 Law Lib. 38.) If the contract be legal it was for an entire service, and there can be no recovery in or out of the contract, unless there has been a full performance of the service.
The case of Cutter vs. Powell, is conclusive. The bill goes for the specific performance of an entire contract, on the ground of performance, *Page 190 
quantum meruit will not do; service indivisible; large sum stipulated for an entire service; no recovery as for a part performance. In contracts for personal service, there can be no apportionment; no rule to apportion by; eminently so in a contract for professional service. How estimated? what did he do? what was it worth? what did he neglect? who can estimate the injury arising from the neglect, and deduct it from the service? But it is said that Col. McLane's letter to Mr. R. H. Bayard, in 1816, admits the entire performance of service on the part of his father. The state of the matter then was an appeal pending in the Circuit Court, and the collector resisting the power of remission in the government. This letter had reference to a claim against the U. States for this illegal remission; and as the collector had already "expended considerably of his private funds" in carrying on this controversy, he called on the representatives of Mr. Bayard for that service which their father was to have given. No aid was given. The treatment of that letter was an unequivocal abandonment by the representatives of Mr. Bayard, of any claim or interest in the matter referred to by Col. McLane. The case had been abandoned by Mr. Bayard; the claim was abandoned by his family, who were unwilling to accept Col. McLane's offer of a share of this controversy with the U. States, which was neither then or ever productive of any thing. That which was finally obtained after fifteen years more of litigation by Mr. McLane and his representatives, was recovered upon an entirely different suit and claim from that of resisting the remissions.
Can the court send an issue, and for what? never, unless it first decides on the right to recover, and this decision must be on a case made by the bill, to which the respondent has the opportunity of making defence in this court. If there was any thing due to Mr. Bayard, it arose at the time of the service rendered, and is barred by limitation many times over, The memorandum agreement is not under seal, and the act of limitation run from the first receipt of avails by the collector. If the compensation was ever earned, it must have been before Mr. Bayard's death, now twenty-six years ago, a length of time that would her recovery on a bond or judgment. This and all other defences are cut off by allowing this partial claim to be set up in this form.
The idea of a quantum meruit out of the contract, proceeds on the notion of services rendered to Col. McLane, at his request, in the argument before the District Court; a service which was rendered *Page 191 
not to him but to the United States government, and paid for by it. The court must see that there has been meritorious services performed, before they will decree an account or direct an issue. Now they will see that Mr. Bayard contracted for a series of services, and rendered but one if any under the contract; that this service was rendered to another, and paid for by another. A service rendered at most in the case of the ship Good Friends. And must not this court decide, before they can decree any thing on the ground of a quantum meruit, that that service has not been full compensated? Yet Mr. Bayard himself, by his receipt to the U. States, states that it has; and even gives a detailed statement of the service as an excuse for the amount of the fee.
If a quantum meruit is to be decreed, to what extent shall it go. To the ship alone; the ship and cargo; or all the ships and cargoes? We are called here on a claim of hundreds of thousands; will the court now suffer them, without notice, to set up a claim out of the bill and out of the case, on a mere pitiful question whether $500, or what sum is compensation for one argument. (6 Eng. Ch. Rep. 410.) This claim for a partial recovery is not set up in the bill, nor was it raised below. A party cannot recover under the general prayer for relief, on any ground of relief not set out in the bill; for the defendant would have no notice of the claim, and no opportunity to make defence to it.
DIVERSITY OF THE FUND. — We now come to demonstrate the absolute diversity of the fund stipulated between the parties as the source from which this compensation was to be derived, and the fund of which a portion is sought in this suit.
The fund contracted for was the ship, in the one case; the ships and cargoes in the other: the ship as forfeited. If it remained in specie, that was the fund contracted for; if sold by the decree of the court, then the proceeds stand in place of the ship, and constitute the fund. A specific forfeiture — to be recovered in the very suit in which the service was to be rendered. On this point also, the case ofStevens vs. Bagwell, is an authority as well as on the other two points of champerty, and the unreasonbleness of the contract. The source was not merely what should be recovered, but recovered in the suits in which Mr. Bayard was to render service. Yet the fund here resulted not from those suits, but by legislative grant — the terms of a remission — which put an end to the suits and totally destroyed any possibility of any avails ever resulting from them. *Page 192 
It is argued on the other side that Mr. McLane's title became vested by the condemnation. Yet the contract was not for services up to the time of a title vesting, but to secure an indefeasible title and actual results from an indefeasible title. Mr. Bayard's right to call on the collector, and his duty to pay, was not on condemnation, but upon final recovery. Suppose after the recovery the ship had been destroyed by fire; or the claimants on whose bonds the property was delivered up had failed, was the collector bound to make good to Mr. Bayard his share? The contingency then is recovery; final recovery; recovery according to its legal meaning, by judgment of court; and recovery in the suits in which the service was to-be rendered.
The argument of the other side is, that the source is what should be finally recovered in conveyance of the seizure. The seizure is only one step in the legal proceedings; an official act of the collector to be followed up by prosecution: the result is no more the fruit of the seizure, than of the libel — the condemnation or prosecution of the appeal; and the fund now sought to be divided, is no more the result of the seizure than of the prosecution or condemnation. The money was obtained not in consequence of an act of justice — of punishment — but of mercy; it arose not from condemnation but from remission, a remission which defeated condemnation and destroyed the results of seizure, as well as of condemnation. How can a remission be said to be in consequence of seizure? It may be before as well as after seizure. As well might we say, that the pardon of a criminal was in consequence of his arrest. The fund therefore resulting from the remission is not a consequence or result of the seizure, and is, consequently, not the fund out of which the compensation was by the contract to arise.
Does the contract look to any such source of recovery? On the contrary, it looks exclusively to forfeiture and condemnation, and the results of forfeiture and condemnation as the source from which compensation should arise. It is true, that the terms on which the remission is granted, the payment of double duties, were in the nature of a forfeiture for the offence, but is this identical with the forfeiture sought under the seizure, or arising from the violation of the non-importation laws?
THE SUIT OF McLANE VS. THE U. S. — Was Mr. Bayard bound to act as counsel for McLane in the case that subsequent arose between him and the U. S., for the distribution of these double duties, which *Page 193 
were paid as the condition of the remission of the forfeiture? We say not; and herein we agree. He might even have been employed by the U. S., against Mr. McLane in that suit. It was the pursuit of a different object — a thing differing in specie, and vesting by a different and contradictory title. And after opposing Mr. McLane in that suit; opposing him rightfully and consistently with his contract — is it consistent with that contract that he should turn round and claim under it a share of what the collector recovered? The double duties were recovered in this suit. They were forfeiture or they were not. If they were forfeiture, Mr. Bayard was bound to render his services for the purpose of recovering them, which he did not do; if they were not, then he was not entitled to any part of this recovery as forfeiture.
Conceding that Mr. Bayard was bound to aid with funds in the prosecution of this suit they say, 1st. That L. McLane was an executor of Mr. Bayard, and could have applied the funds; and 2d., that Col. McLane had received a part of the joint fund which passed to his executor? Now L. McLane was never an acting executor of Mr. Bayard, and had none of his funds in hand; and though Col. McLane received the single duties in 1813, he paid them all into the treasury; for this was before the remission, and they were received as duties. It was not until 1822, that the treasury conceded any share to the collector.
Mr. Johnson, in reply:
1. THE FUND. — Is the fund recovered by Mr. McLane in the suit with the U. States a part of the avails falling within this contract as "finally recovered under or by virtue or in consequence of the seizure ?"
The argument of the other side has been, conceding that the contract would have covered the property condemned, or its proceeds, yet that because the U. S., by an act of legislative grace, stepped in after the condemnation and before sale, and pardoned the forfeiture on payment of a substituted fund, that this fund does not come within the contract, and the complainant is entitled to no share of it: that because the act of 1813, makes the title of the collector to depend on forfeiture and not on seizure, therefore the fund obtained under the remission is not the fund contracted for. But that argument goes too far. It would equally apply to the property condemned in specie, or to the actual results of that property if sold; for that by the same argument is a result of forfeiture, and not of seizure. "The forfeiture *Page 194 
accrues from the violation of the law;" granted; but the period of forfeiture is a continuing one. It occurs wherever the ship may go. Though passing through several collection districts without seizure, and forfeited all the while, because violating the law all the while, yet the collector who seizes and prosecutes to condemnation is entitled to the avails of the forfeiture. (Act of 1799, secs. 89, 91, c.) It could be shown that the forfeiture of these ships and cargoes actually first occurred in Col. McLane's collection district; but no matter, they were seized by Col. McLane in his collection district, and it is not disputed that had these seizures gone on to condemnation and sale, Col. McLane would have been entitled to his share of these results as collector. Then how did he get the fund now in court? We have been told it was given to him by the act of 29th July, 1813. Yet that act says nothing about the collector; it gives him nothing: he gets it only because he was entitled to his sharebefore by virtue of the forfeiture and his seizure, and because that act did not take it away from him.
By the seizure he obtained an inchoate title, a title perfected by condemnation as against all the world except the U. S., who by virtue of the pardoning power could step in between the crime and its punishment, and thus defeat the collector's title. If in the exercise of this pardoning power the U.S., did not pardon the whole, whatever was not pardoned was left to the operation of the law establishing the forfeiture, and giving a share of it to the collector seizing and prosecuting. So argued by Mr. Sergeant and so decided in 6Peters' 412, 415, 426, 428. "If the double duties be considered a part of the forfeiture, then the seizing collector is entitled to his share of it." "The double duties are a mere mode of fixing the sum reserved from the remission — left as forfeited; and the U. S., had no right to reserve such a part without giving to the seizing collector his share of it." Then if Mr. McLane, as the seizing collector, is entitled to a share of these double duties reserved from remission as a part of the forfeiture, would he not equally and from the same source, and by virtue of his seizure, have been entitled to thewhole if the U.S., had remitted no part? And yet it is argued that this is not the same fund.
Stevens vs. Bagwell (15 Ves. 140,) has been referred to by all the counsel as a case strongly in point for them. It is against them. The decree there was against the assignor, not as here for Col. McLane. The fund wasgiven to them by the crown, of its mere grace; not as hererecovered against the U. S., in invitum — by suit in court, *Page 195 
and on his title previously attached; and which the U. S., not only did not give,' but could not take away.
Suppose the case of a qui tam prosecution in this State and a recovery. The judgment of the court entitles the informer toone-half. But the governor steps in and pardons one-half the penalty. The informer receives the other half. Does he receive it by virtue or in consequence of the remission, as a, gift from the governor; or does he not recover it by virtue and in consequence of the suit and recovery? a title which the governor neither gives nor can take away
2. THE ABANDONMENT. — Was the contract abandoned by J. A. Bayard, or by his representatives?
The first argument on the other side to show that it was abandoned is, that Mr. Bayard was the counsel of the U. S., and that his argument is to be referred to that retainer; and next, that the contract was relinquished by his taking the retainer of others inconsistent with the contract; and third, though not abandoned by Mr. Bayard in his lifetime, that the contract has been waived and abandoned by his representatives.
The property in controversy amounted to near a million of dollars, to one-half of which the U. S., would be entitled in case of condemnation. In such a claim, the government paid to Mr. Bayard a fee of $500, for his services performed for the U. S.; and from this receipt it is argued that Mr. Bayard abandoned his contract with Col. McLane, and took pay altogether from the U. States. But the answer makes no such defence. It regards the argument of Mr. Bayard not as an argument for the United States exclusively; but it admits that, so far as it went, it was a part performance of the contract with Col. McLane. Mr. L. McLane received from the U. S. the same fee of $500, for his services in that argument, and gave a receipt in the same words as Mr. Bayard. Did he also relinquish and abandon his contract with the collector? No such pretence is made by his answer.
Again: Mr. A. McLane, by his will in 1821, before the case stated with the U. States, and before the case of U. States vs.Morris, when it was certain that the collector was entitled to one-half the double duties, recites that he had assigned to L. McLane all his interest under the forfeiture, which he evidently considered as one-third part.
Mr. Bayard was, as Mr. McLane was, counsel for the U. S., andalso counsel for the collector, both being interested in the results of the suit. This receipt then proves nothing, except the payment by *Page 196 
the U. States of their share of a fee to counsel, who were also counsel in the same matter for others. Is there anything strange in this? Look at the receipt of C. J. Ingersoll for the duty bonds, signed by him as counsel for the U. States, and also as counsel for the collector. The connection of Mr. Bayard with Spackman is no better evidence of an abandonment of his contract with Col. McLane. The only contract Mr. Bayard had with Col. McLane at the date of the letter to Spackman, was the contract of April, 1812, relative to the Good Friends and cargo, and did not extend to the Amazon and United States. He never was retained in the case of the United States, unless by the memorandum agreement of subsequent date. The letter to Rodney states that he had received the fee of Spackman, supposing him to be an informer
in the case of the Amazon. This retainer was entirely consistent with his duty to Col. McLane. Both looked to forfeiture. Between these letters he had discovered that Spackman was but an agent of Thompson Maris, claimants in the case of the Amazon; and he returned the retainer as inconsistent with his duty to Col. McLane, under the contract of April, 1812. Yet the argument on the other side is, that the act of taking the fee of Spackman was an abandonment in fact and intention of his contract with Col. McLane; and the letter to Mr. Rodney is cited as the evidence of it. The letter from A. McLane to J. A. Bayard mentions the case of the Tiber, retains him in that case, and offers the same interest which he has in the other Amelia cases. Yet it is argued that he had then no interest inthese cases, but had abandoned his contract. And near a year afterwards Col. McLane, by indorsement on the back of thecontract of April, 1812, under his hand, extends it toall the Amelia cases.
But say they, this memorandum agreement was not accepted by Mr. Bayard. What evidence would they have of the acceptance? It is admitted that it was not necessary that Mr. Bayard should have signed it. Is not the fact of it being in his handwriting, that it was taken and kept in his possession, evidence of his acceptance of it? Finally, after Mr. Bayard's death we find Col. McLane writing to Mr. R. H. Bayard, sending him the record in the case of the Good Friends, and stating "we are jointly interested in the case." Yet in the face of this, it is argued that Mr. Bayard had no interest under the contract of 1812; that he had abandoned it by taking a fee from the U. States; and taking, (though he returned it) a fee from Spackman. *Page 197 
3. THE PERFORMANCE. — Assuming that there was a contract between Mr. Bayard and Col. McLane, not illegal or otherwise vitious, was it performed in whole or in part so as to entitle the representatives of Mr. Bayard to claim the stipulated compensation?
The object of the contract was to procure a decree of forfeiture against the property seized as forfeited. This was the end and design of the contracting parties. The receipt of the proceeds of forfeiture followed as a matter of course, and could not have been the subject of contract. Sec. 4 of the non-importation act covers voluntary importation, and makes the forfeiture to depend on the importation. Sec. 5 provides, that the shipping goods with intent to import them, creates a forfeiture of the goods. Sec. 6 provides, that the shipping the goods with the intent of importation and with the knowledge ofthe owner or master, forfeits the ship. The result of this is, that when you make out a case of forfeiture of the ship, the forfeiture of the goods is necessarily established; though the reverse is not true. Then what had Mr. Bayard to do? He had to make out that the goods fell within the 4th or 5th section of this law. But with regard to the ship he had also to make out the shipping the goods with the intent to import, and with the knowledge of the owner or master.
What was the case Mr. Bayard had to manage? The non-importation laws were passed in 1809. Mr. Girard and others had shipped these goods from England, without any intent of violating these laws. The ships went to Amelia Island. In 1811 Congress passed a secret act, authorizing the president to take possession of Amelia Island as a part of Florida, on certain contingencies. General Matthews, claiming to act under the orders of the president, seized on the island. These importers found him there, and took a clearance from him for the goods imported. The defence was then — 1st. That the goods were notintentionally imported in violation of the non-intercourse laws. 2d. That Gen. Matthews was there, professing to act under authority which the U. States was reasonably supposed to have conferred on him. 3d. That the ships came to the II. States under constraint and force from Gen. Matthews. 4th. That the declaration of war put an end to the non-importation laws. All these were grave questions for Mr. Bayard to combat, before he could get a condemnation either of cargoes or ships. They arose in all the cases; and all the cargoes werenecessarily involved in the argument of the ship Good Friends.
Then what did Mr. Bayard stipulate to perform? To render "services *Page 198 
as counsel in the courts of the U. States, for the purpose of obtaining condemnation of the property seized." Condemnation; judicial condemnation: condemnation in the courts: and in the cases in such courts. Mr. Bayard was to do no more. It is true that Col. McLane's obligation to pay did not attach on such condemnation, nor until the receipt of the proceeds; but Mr. Bayard's duty was performed. Mr. McLane knew of the power of the secretary of the treasury to remit, and of the contingency of new suits arising under that power; yet he contracted with Mr. Bayard for services in procuring condemnation, and not in any collateral or contingent suits. The answer admits, and Gen. Jones in his argument admitted, that the suit of Col. McLane against the U. States was not within the contract.
I assume then, that if Mr. Bayard did render services in the courts of the U. States, for the purpose of procuring condemnation, and did procure condemnation, he performed his contract.
What is the evidence of performance? The receipt of the 7th of December, 1812, which they have relied on as showing an abandonment, shows something else; it shows that all the services collateral, incidental, argument and all, were performed by Mr. Bayard up to that time. The receipt shows also that the argument was in the case of the cargo as well as ship. It proves conclusively that Mr. Bayard up to the 7th of December, 1812, did all that he was bound to do by his contract. The motion for delivering up the property on delivery bonds was before that date, and was argued by Mr. Bayard, if argued at all. And from the decision of that motion, there could be no appeal, for the judgment on it executed itself immediately.
The decree of condemnation was obtained. That decree unreversed, though the decree of the first court, was as binding and conclusive as the decree either of the Circuit or Supreme Court. What further was Mr. Bayard to do? We would almost suppose from the arguments of our opponents, that he was bound to take and prosecute an appeal for the other side. No! He had nothing to do with an appeal until they moved in it. An interference on his part productive of appeal or of active prosecution of appeal, would have been a violation of his duty to Col. McLane. But an appeal was taken in the case of the Good Friends. What was done under it? The record was read of the decree in the Circuit Court, to show that there was an argument there. No such thing. The answer itself admits that there was no argument there: and as to this the answer *Page 199 
of Mr. McLane is conclusive, for it is an answer to facts necessarily within his knowledge as associate counsel, bound as such as "well by the relation to his father, to have attended to every thing which transpired there. If there was any such argument in the Circuit Court on the question of affirmance or reversal, it must have been at the term in which the decree was affirmed, which was September, 1818, four years after Girard had availed himself of the remission, and paid the costs, which was one of its conditions. After this it was not in hispower to dispute the remission, nor to dispute anything which it established. But it established the forfeiture; it proceeded on the forfeiture, and it was not, therefore, in Girard's power, after the 16th of March, 1814, to dispute the correctness of the decree of the District Court. What then was Mr. Bayard to do? Was he to make an argument to sustain a decision which was not only not attacked, but which the defendant on the record admitted to be right.
We have been misunderstood as contending that Mr. Bayard was the exclusive judge of the services which the contract bound him to perform. No such thing. The agreement was with a professional man; for the exercise of reasonable professional skill; necessarily to some extent involving his opinion as to the mode of its exercise; but still subject to the judgment of this court, whether he did reasonably peerform his contract. He was not bound to attend in court, de die in diem, whether there was any movement in the cause or not. Nor was it for Col. McLane, the collector, to prescribe to him the mode of performing it. He was bound to render service under the contract, for the purpose of the contract; to ripen the incohate title commencing in the collector by the seizure, into a complete title by condemnation; indefeasible except by authority of the U. States government. That power being known to the parties was not contracted against, and could not be lawfully contracted against.
The cases cited on the other side, for another purpose, show that the right of the U. S. to remit, was an absolute right in reference to the forfeiture. (Bud vs. Van Ness; Jones' ex'r. vs.Shore.) Mr. Bayard could not have contracted with the collector to resist that right of remission in the U. S.; nor to resist the passage of the act of the 29th July, 1813, under which Girard obtained the remission. In October, 1822, the case was stated on which the collector instituted his suit against the U. States, for a division of that part of the forfeiture reserved from remission. That case did not even controvert the right of the U. S. to remit at any time before actual receipt of the money. Mr. Bayard, *Page 200 
therefore, was not only not bound by his contract to controvert this question with the U. States, but the collector himself did not controvert it.
Then has he not performed his contract? If he was to render service for the purpose of procuring condemnation, he has done it. If he was to procure condemnation, he has done it: — final condemnation, he has done it. And if he has failed to render service in another case, to dispute the power of the U. States to grant remission, or in a case between the collector and the U. States; the answer is, he was not bound to do it. We do not then dispute about a division of personal services, or a performance by substitution; but we insist that Mr. Bayard has performed, fully performed, all the service for which he contracted.
We have also been misunderstood as arguing that there were distinct grades in the legal profession. We claim no such distinction of persons in the profession, but we do insist that there is a distinction as to the functions united in the same person. The contract of Mr. Bayard was to render service as counsel, did that bind him to write every line of the pleadings belonging to the proctor or attorney? If so, then Mr. L. McLane and Mr. Read, the district attorney, had nothing to do. Why was L. McLane taken in to share equally with Mr. Bayard? He was then a young man — without professional standing — taken in at the request of his father, Col. McLane, and liberally rewarded by the agreement of Mr. Bayard as well as of Col. McLane? He was so taken in to perform that portion of the service which usually falls to the junior counsel; to do the duties of attorney. All that Mr. Bayard was to do was to act as counsel, and to see that all the other acts were right. All were right; condemnation was secured. And shall he have nothing?
If nothing but the single duties (which were paid in 1813) had been received, the collector was entitled to one-half of that; but, in Feb. 1819, $53,000 00 was received, all of which belonged to Col. McLane (the single duties having been all received by the U. S.,) to be divided in thirds with his counsel. On the 6th of February then 1819, Col. McLane had in his hands the one-third of $53,000 00, belonging to Mr. Bayard, as money had and received to his use, recoverable in an action of assumpsit. But as a defence to the payment of the money so belonging to Mr. Bayard, he sets up that the 17. States, another party claiming it by title paramount, had set up a claim to it, of which claim he gave us notice and required us to defend it, *Page 201 
which we did not: and though that claim failed, we are not to have anything because we did not defend it. The principle is a clear one. Holding a fund of ours to which another set up a claim, he had the right to defend that claim at our expense, and out of the fund, and the claim failing he is bound to pay us the balance.
CONSTRUCTION OF THE CONTRACT. — Does the contract of the 21st of April, coyer the cargo of the Good Friends?
The first question is whether, looking at the paper itself, it is not to be collected as the understanding of the parties, that the cargo was embraced as well as the ship. Why change the phraseology from the ship seized, to condemnation of the property seized? But, when we look beyond the paper to the relation and condition of the parties, it is impossible to suppose that cargo as well as ship was not in the contemplation of the parties. The counsel on the other side spoke of the great value of the ships. The Good Friends was valued, al $5,000: her cargo at $298,488; the Amazon at $4,500: her cargo $316,124; the United States at $9,000: her cargo $12,617; making the ships $18,500; the cargoes $627,730: total $645,730. Then the collector was entitled to one-half of $645,730, according to the law as understood before the case of U. States vs. Morris. Now if you exclude the cargo of the Good Friends from the agreement of the 21st of April, it gives to Mr. McLane one-half of her cargo and one-fourth of the ship, making $150,000; while it leaves to Mr. Bayard the one-fourth of the ship, or $800. Is it reasonable to suppose that Mr. Bayard agreed to argue the cases for the one-half, and afterwards a third, of the ship Good Friends, valued at $5,000, (say $800,) and that contingent,
when Col. McLane would have been entitled to about $300,000? Who was Mr. Bayard; what his professional eminence: what the sum in controversy; whence derived; from what owners? Who was Col. McLane? A man, as appears from his letters, who lived on the professional aid of Mr. Bayard. Can it be supposed then that between such parties, in reference to such a claim, Mr. Bayard would have contracted for a contingency of $800, out of hundreds of thousands; giving up the greater certainty he might have had from the other side. The condition of the parties, and of the subject matter of the contract, is always to be regarded in giving a construction to it. (1 Stark. 463; (2 vol. cd.)citing 1 Term. Rep. 180.)
The answer concedes that the intent of the indorsement of the 8th of May, 1813, was to bring in not the cargo of the Good Friends, *Page 202 
but the two other ships and cargoes. The letter of Col. McLane admits its extension, and offers to engage him in the case of the Tiber, on the same terms. And. on the 12th of June, 1816, after Mr. Bayard had been dead a year, Col. McLane sends to R. H. Bayard the records,c, in the case of the Good Friends, and says they were jointly interested in the matter. But at that time there was no claim founded on the ship Good Friends. She had been, entirely discharged. Mr. Girard had availed himself of the remission on the terms of paying double duties on the cargo; nothing on the ship.
MEMORANDUM AGREEMENT OF 1813. — I proceed then to inquire whether the memorandum of the 8th of May, 1813, does not show, that prior to that time the United States and Amazon and their cargoes, as well as the cargo of the Good Friends, stood on the same contract as the ship Good Friends.
This memorandum was the written expression of a previous agreement, founded on a valuable consideration. Was it not a sufficient consideration? Mr. Bayard when receiving the fee of Spackman, supposed him to be an informer, and therefore claiming consistently with Col. McLane; but finding out that he was an agent of Thompson Maris, the owners and claimants of the U. States and Amazon, whose claim was directly hostile to Col. McLane, he then returned the fee. "Was not this a consideration for the contract with. Col. McLane. That contract tied the hands of Mr. Bayard; made him give up a fee already received, as well as incapacitated him from receiving any other. (1 Com. Cont.7, 22.) Now we do not pretend that the memorandum agreement was altogether on an executed consideration. He was bound to do whatever should become necessary to be done in these cases, for the same purpose contemplated in the original contract as to the ship Good Friends and cargo. Is the objection of want of mutuality solid? A promise of money, for service; of service, for money. There is no distinction between a contract to perform services of this kind for money, and a contract to perform physical services. (2 Powell Cont. 233, 232.) Theobligation of the contract must be mutual; there need not be the same mutuality of remedy. (Story Equity 30; 1 Mad.Ch. 422.) It must be so, for there are a great variety of cases not admitting of a specific performance on both sides. The argument is, that a contract is void for want of mutuality, unless a court of equity can decree and enforce specific performance, at the suit of either party against the other; and it assumes that a court of law or of equity will not, after *Page 203 
performance by one party, decree, what it is admitted it may decree, payment by the other, because if the parties had been reversed the court could not have enforced a specific performance. Such is not, cannot be, a principle of any court of equity.
But I deny that this is a bill for a specific performance, as understood by the other side. I admit gratia argumenti that we are in equity solely because of the relation of the parties; and yet in such a court we are met with the objection, that though you have performed your part, though I have received all the money, the court cannot decree payment against me because it could not have compelled a specific performance against the complainants. No. The rules as to such a case are the same in equity as at law. Where the court cannot compel performance of services it will decree a remuneration in money.
QUANTUM MERUIT. — What is the character of complainants' bill, as it regards the nature and extent of its object?
The bill sets out by stating the contract of the 21st and 22d of April and 8th of May: alledges that Mr. Bayard commenced performance and carried it on to condemnation: that two appeals were taken, neither of which was prosecuted: that on the 6th of February, 1819, the sum of $53,000 came into Mr. McLane's hands, and that a controversy arose with the U. States as to his share of the double duties: that a case was stated in 1822, in the Circuit Court, to determine this controversy, which was determined in 1832, in favor of the collector, for one-half the double duties. The bill alledges the uncertainty of this amount; prays an account, and for general relief. It is determined by all the cases, that for the purpose of obtaining relief under the general prayer, you are to look, not at the consistency of the particular relief asked for at the trial with the particular relief prayed in the bill, but at its consistency with the case stated in the bill. (Mitf.PL 38; Hines Prac. 17: 2 Mod, 91; 13Vesey 113; 6 Gill Johns. 152; 2 Cond. Ch. Rep
439.)
Now what is the dispute between us? They contend that, because the bill states an entire execution of the contract, and prays an account, we are not entitled to a partial execution of the contract. Yet the relief sought under either is an account, and both are consistent with the case made by the bill.
Are we at liberty to make points here, not made in the court below? Now the very object of an appeal is the correction of the errors of the court below, and the appellate court looks not to the *Page 204 
grounds or reasoning of the court below, but to the points which the case itself presented to the court. (3 Gili Johns.
435-41; Laws Maryland 117 (1825:) 2 Shoales Lefroy 11; 1 Gill Johns. 216.)
THE LEGALITY OF THE CONTRACT. — Was the contract of the 21st of April, 1812, as modified the next day, and again by the agreement of 8th May, 1813, in whole or in part an illegal contract either because of some original inherent vice, or because of some statutory or common law prohibition?
1. Was it unconscionable and unreasonable? Taking the appraised value of ships and cargoes at the amount that might have been recovered, the collector and his son would have received $219,000, and Mr. Bayard $107,000: taking the amount actually received, the share of Mr. Bayard would be $26,000: that of the collector and. his son $52,000. The collector had done one act, the seizure; and was to do no more. Even that was an act of official duty. The counsel undertook to do all the rest. Mr. Bayard was to devote his professional life in the service, if the cases required it, and to be compensated out of the contingent fund that might be recovered by these services. In no event could the collector lose, for he was to pay counsel nothing except out of what should be recovered.
2., Was then anything in the relation of the parties which rendered this contract obnoxious to the censure of a court of equity?
The letter from A. McLane to J. A. Bayard of 13th Jan. 1813: — "Your attention, c. will multiply the many obligations I am under to you," c. — the letter of 9th Feb., and all the corsespondence show that Col. McLane leaned on this counsel as his chief support in these lawsuits. Is it to be tolerated that standing thus, operating the entire recovery of such a sum from such a source, the, avails should be divided between the collector and his son, a young man then just come to the bar, and Mr. Bayard turned out of court because the contract is unreasonable; or because of its contingent nature, when such contracts are of daily occurrence? (Stevens vs. Monges, 1Harr. Rep. 127; Rogers vs. Randel, 2Ibid 499.)
Passing from the consideration of its reasonableness, is this contract void by reason of any illegality on the face of it?
3. ATTORNEY AND CLIENT. — Is there any civil regulation prohibiting and repudiating this contract? The only one insisted on is the relation of client and attorney. The argument is from analogy to guardian and ward, husband and wife; and the proposition is, that from the relation itself, independently of any consideration of unreasonableness, *Page 205 
the contract must be repudiated. But by the law of Delaware attorney and client may contract, so that there be nothing unreasonable or extortionate in the contract. In the case of guardian and ward, there is an incapacity to contract: so of husband and wife. The contract cannot be sustained because there is a want ofpower in the ward and wife to contract. Concede that the ward can make a contract, and it will follow that the court must examine into its terms and enforce it, if reasonable. It is apparent, therefore, that the analogy is not correct. The attorney in England stands on the same ground. He may contract with his client, but the contract is by statute restricted to a certain amount. And by the decisions he is compelled even to return any sum received beyond that. Why? Because he is not capable of contracting beyond that amount. He stands in the condition of the ward, and the wife. It is the same with counsel, who are not permitted to contract at all. But repeal the statutes restricting the fees of attornies; give the right to counsel to recover fees and to contract for them; and the whole reason of the cases fails, and the cases fail with it. The contract is lawful, and it is then only for the court to ascertain if it be fair. I admit that the courts will scrutinise such contracts, but they must enforce them if they discover nothing unreasonable.
4. CHAMPERTY. — I inquire, then, whether this contract is void as the violation of any criminal law.
In construing a criminal statute, the court must look to the state of society in which it was enacted. Inquire whether from the state of society existing here in 1826, that statute was intended to apply to counsel and client. By the 28 Edw. 1, ch. 11, an exception is made which existed at common law in favor of next of kin, friends and counsel. But for that exception every lawyer who opened his mouth for a client, would "be guilty of maintenance; and, if for a contingent reward out of the fund, would be guilty of champerty. Every son, every relative in like manner. (Westm. 2,ch. 49.) All purchases of property hanging in pleas are forbidden. Yet notwithstanding the words cover all purchases, they do not cover a bona fide purchase of the property. (1 Swans. 42, 55-6-8; 2 Hawk. 408, sec. 12; Stat. 33 Edw.
1.) "Champertors be they that move pleas or suits and sue them at their proper costs for to have part of the land in variance or gain." (2 Inst. 208.)
The usage of Delaware is a usage against which this court cannot shut its eyes. "What is that usage? To contract for compensation — *Page 206 
contingent compensation out of the fund recovered. Commissions on collections, (five per cent., of the sum collected) are fixed by the bar regulations. The Legislature knew of this. Did then they mean that the law of 1826 should apply to such contracts? No. It stands out of the law of champerty just as a son and brother, c., stand out of the statute of England. The relation exists which authorizes this kind of contract, and the courts say that the exception exists. Champerty is but a species of maintenance.
I have shown that the genus does not extend to counsel now as to the species. (Blac. Com. 134; 33 Edw. 1, ch. 11.) Champerty must be just such a case that would be maintenance, without the contract to he paid out of the sum recovered. Then, if the son,c., do not fall into the prohibition against maintenance because from their relation, a meddling in the suit is not officious, so if counsel are not guilty of maintenance by promoting the suit, they are not guilty of champerty by doing so for a part of the thing. (3 Cowen 643, 648; 1 Pick. 416; 1 Hammond 143.)
But this contract is not champertous on other grounds. The policy of the act of Congress giving the collector a share of the forfeiture, is to stimulate the collector to prosecute. One object of this is to enable the collector to employ other counsel than the district attorney. The law makes his interest in the forfeitureassignable.
The danger of champerty does not apply to these contracts with the collector? The U. States is a party to the suit, having full control of the suit; and the government would not permit a suit to be carried on in which there was anything improper, for litigation. The government cannot commit champerty.
The policy of the laws of this State as to certain matters,encourages the prosecution of certain offences, and gives to the informer a part of the thing in suit, which would he champerty, except that it is never applicable to a government, because it cannot be supposed that a government could ever set on foot an improper suit. (1 Del. Laws 217, 192, 191.) And, if there can be no champerty on the part of the government, in relation to suits prosecuted by it, it follows that there can be no champerty by an informer or public officer who prosecutes such suit. The character of the government is a guaranty against the danger of champerty.
What is there in the cases cited which assume that the meretendency to champerty, avoids the contract in equity? If the contract is not champertous; not so because legal; it cannot tend to illegality. *Page 207 
On the authority of Stevens vs. Monges. (1 Harr.Rep. 127,) this contract is legal; and if so. it is idle to say of such contract, that it tends to illegality. The ground on which a contract is by the cases supposed to be tainted by champerty, is that it leads to that offence,
The eloquence on the mischief of champerty has been thrown away. They were reduced to the necessity of admitting that the consequence of refusing to allow counsel and client to contract, is to compel the client to pay the lawyer before-hand: which is the result of the principle in England. How would that system do in Delaware? Clients compelled to employ counsel or give up their rights; compelled to pay that counsel not only a certainty, but before the service is performed. How is the poor man to assert his rights? Such a principle is not only pregnant with danger, but would certainly be ruinous. Take this case, which was against wealthy merchants, for an immense property. Col. McLane comparatively poor, applies to counsel. Mr. Girard comes and offers his thousands for defence; Mr. McLane approaches with his hundreds, or with nothing, unless he is permitted to contract for a share of the matter in controversy. Is there less danger of the effect of this on the administration of justice, than in allowing him to make such a contract?
The first argument of this cause occupied thirteen days; the final argument commenced on Thursday, Dec. 10th, and closed Monday, Dec. 21st, 1840. On thursday Judge Harrington delivered the unanimous opinion of the court.